UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARIE TURANO, LEONARD TURANO and
GEMMA SAMELE, individually and on behalf of
all persons similarly situated,

                         Plaintiffs,

                  -against-

HOWARD ZUCKER, as Commissioner of the New
York State Department of Health,

                        Defendant.

**CV 17-      3397**

**Civil Action No.:**

**CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

**SPATT, J.**

**TOMLINSON, M.J.**

## PRELIMINARY STATEMENT

1.    Named Plaintiffs Marie Turano, Leonard Turano, and Gemma Samele and all members of the class they seek to represent, are Medicaid recipients who have long-term illnesses and disabilities that make them dependent on long-term care services, including home care, in order to continue living in their homes in the community. They are now at risk of reductions or terminations of their care in violation of the Medicaid Act and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

2.    Defendant Zucker, as Commissioner of the New York State Department of Health ("DOH") requires that Named Plaintiffs, and members of the proposed class, be enrolled in Managed Long Term Care plans ("MLTCPs"), in order to receive Medicaid funded home care.

3.    Defendant Zucker has not created a transition plan to protect enrollees' rights when an MLTCP closes.

1

4.      GuildNet, Inc. ("GuildNet"), a private not-for-profit corporation, is the MLTCP that currently provides the home care services upon which Plaintiffs rely.

5.      In March 2017, Defendant Zucker allowed GuildNet to send letters to all its enrollees in Nassau, Suffolk, and Westchester Counties stating that it would no longer provide long-term care services in those counties starting on June 1, 2017.  An example of this letter is attached as Exhibit A.

6.      The letter advised enrollees that if they wanted to continue to receive long-term care services, they would have to obtain those services from another MLTCP by June 1.

7.      The letter did not inform the enrollees how, if at all, they could exercise their statutory and Constitutional rights to receive the same level of services, whether through GuildNet or another plan, until and unless they received timely and adequate notice and an opportunity for a Fair Hearing prior to any reduction or termination in care.

8.      GuildNet enrollees were thus forced to reapply for services through other plans, but in many cases those plans would not schedule assessment dates before June 1.

9.      GuildNet enrollees who were able to obtain new assessments from other plans were routinely offered amounts of care that were completely inadequate and substantially less than what they had been receiving through GuildNet.

10.     In May 2017, after receiving complaints from enrollees and their advocates about GuildNet's letter, Defendant Zucker sent a new letter to all GuildNet enrollees advising them that they do not need to transfer to a new plan by June 1, and that "the State requires GuildNet to continue providing your existing services until a smooth transfer can be completed to your new plan of choice."  A copy of this letter is attached as Exhibit B.

11.    Like GuildNet's letter, Defendant Zucker's letter does not inform enrollees how, if at all, they can exercise their right to maintain their existing services until and unless they are given an opportunity for a Fair Hearing to challenge any proposed reduction.

12.    Plaintiffs are thus being deprived of their statutory and Constitutional rights to a timely and adequate notice and a pre-reduction Fair Hearing, in violation of the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, and its implementing regulations; to live in the most integrated setting appropriate, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*; and procedural and substantive due process rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized by 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory and Constitutional rights under color of law.  It is also authorized by the Americans with Disabilities Act, 42 U.S.C. § 12133, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a(2), as an action seeking redress for discrimination on the basis of disability.

14.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events giving rise to the claims occurred and where two of the three Named Plaintiffs reside.

## PARTIES

15.    Plaintiff MARIE TURANO is a 77 year-old woman who resides in Aquebogue, New York, located in Suffolk County. She is a recipient of Medicaid and Medicare who currently receives home care services through GuildNet.

3

16.     Plaintiff LEONARD TURANO is an 86 year-old man who resides in Aquebogue, New York, located in Suffolk County. He is a recipient of Medicaid and Medicare who currently receives home care services through GuildNet.

17.     Plaintiff GEMMA SAMELE is an 89 year-old woman who resides alone in Tuckahoe, New York located in Westchester County. She is a recipient of Medicaid and Medicare who currently receives home care services through GuildNet.

18.     Defendant HOWARD ZUCKER is the Commissioner of DOH, and as such, is responsible for the administration of the Medicaid program in the State of New York. He maintains an office at Corning Tower, Empire State Plaza, Albany, New York.

## THE APPLICABLE LEGAL FRAMEWORK

### *The Medicaid Act*

19.     The Medical Assistance Program ("Medicaid") is a joint federal-state program established under Title XIX of the Social Security Act ("Medicaid Act") to ensure that rehabilitation, medical care, nursing, and other services are provided to low-income and indigent people. 42 U.S.C. § 1396 *et seq*.

20.     States that elect to participate in the Medicaid program must comply with requirements set out in federal law and regulations to be eligible for federal funds. 42 U.S.C. §§ 1396a, 1396c.

21.     Federal law requires participating states to administer the Medicaid program through a "single state agency." 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1). While the single state agency may delegate certain functions, it is prohibited from delegating "the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(c), (e).

22.     The single state agency responsible for the administration of the Medicaid program in New York is DOH, of which Defendant Zucker is the Commissioner.  N.Y. Soc. Serv. L. § 363-a(1).

23.     Additionally, participating states must administer the Medicaid program according to a plan that has been federally approved.  42 U.S.C. § 1396-1; 42 C.F.R. § 430.15.

24.     With the approval of the Centers for Medicare and Medicaid Services of the United States Department of Health & Human Services ("CMS"), New York operates its Medicaid program using a "Partnership Plan" that, in relevant part, requires most Medicaid recipients to enroll in a managed care organization ("MCO") with which DOH has contracted.

25.     MCOs are privately-owned and operated health insurance entities which contract with State Medicaid programs to provide Medicaid recipients with a package of covered services in exchange for payment by the State of a fixed amount per enrollee. *See* 42 U.S.C. § 1396b(m); 42 C.F.R. §§ 438.2, 438.6.

26.     By definition, a MCO must make medical services available to its enrollees to the same extent as services are made available to other Medicaid recipients in the same area who are not enrolled in the plan.  42 U.S.C. § 1396b(m)(1)(A)(i).

27.     Under the Medicaid Act, medical assistance includes payment of part or all of the cost of home care services or community based long-term care services.  42 U.S.C. § 1396d(a)(7), (a)(22), (a)(24).  These services are furnished to an individual who is not in an inpatient or institutionalized setting, are authorized by a physician, and are provided in accordance with the State's Medicaid service plan. *See* 42 C.F.R. §§ 440.167(a), 440.70.

28.     In approving the Partnership Plan, CMS expressly provided that, with the exception of four enumerated provisions of the Medicaid Act not relevant here, "[a]ll requirements of the

Medicaid program expressed in law, regulation, and policy statement" continue to apply to New York's Medicaid program. *See* Centers for Medicare & Medicaid Services, New York Medicaid Redesign Section 1115 Demonstration, Waiver No. 11-W-00114/2, Waiver Authority at 2 (effective as of Dec. 7, 2016), *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/2015-10-01_1115_waiver_stcs.pdf.

<u>Procedural Requirements Upon Termination of Medicaid Funded Services</u>

29.     Federal law and regulations, and the Due Process Clause, require timely and adequate notice to Medicaid applicants and recipients of any action to deny, discontinue, suspend or reduce medical assistance authorization or services. *See* 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b)-(c), 431.210, 431.211, 438.210(c)-(d), 438.404; U.S Const. Amend. XIV, § 1.

30.     Federal law and regulations also require that a state's Medicaid program provide Medicaid applicants and recipients an opportunity for an administrative Fair Hearing when Medicaid benefits are denied, reduced, or terminated. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.220, 438.402.

31.     The required notice must, among other things, explain the proposed action; state the reasons for the action; explain the recipient's right to a Fair Hearing; and explain the right to "aid continuing," which means continuation of their services pending the outcome of the Fair Hearing. 42 C.F.R. §§ 431.206, 431.210, 438.404.

32.     These notices must be sent to Medicaid recipients at least ten days before the proposed action is taken. 42 C.F.R. §§ 431.211, 438.404(c)(1).

33.     When determinations are made to reduce or terminate Medicaid benefits, recipients who request a Fair Hearing in a timely manner are entitled to receive benefits unchanged pursuant to aid continuing directives until a decision after a Fair Hearing is issued. *See* 42 U.S.C. § 1396a(a)(3);

6

42 C.F.R. § 431.230(a), 431.231(c), U.S. Const. Amend. XIV, § 1.  Fair Hearing systems must meet the due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 254 (1970).  42 C.F.R. § 431.205(d).

34.     Once a plan of care is created and services are authorized for a Medicaid recipient, those services may be reduced or discontinued for reasons such as  a change in the client's medical, mental, economic, or social circumstances such that the prior level of care is no longer appropriate; a mistake occurred in the previous assessment; the client refused to cooperate in having a required reassessment; a specifically identified technological development rendered the services unnecessary or less time-consuming; the client resides in a facility or participates in a program that provides the services; or the client can be more appropriately served through other specifically identified Medicaid programs and services.  18 N.Y.C.R.R. § 505.14(b)(5)(iv)(a), (b)(5)(iv)(c).

35.     Closure of an MLTCP is not a permissible reason for reducing or terminating a Medicaid recipient's care.

36.     Federal regulations require New York to include certain provisions in all contracts with MLTCPs that provide Medicaid-funded services, including the requirement that MLTCPs comply with all applicable laws.  42 C.F.R. §§ 438.100(a)-(d), 438.3.

37.     Pursuant to their contracts with the State, MLTCPs provide care and services to adult recipients of Medicaid and Medicare who need more than 120 days of long-term care services and meet certain other eligibility requirements.  *See* MLTC Partial Capitation Model Contract at 16 (effective from Sept. 1, 2012 through Dec. 31, 2014), https://www.health.ny.gov/health_care/medicaid/redesign/docs/mrt90_partial_capitation_model.pdf; *see also* MAP Model Contract at 33 (effective from Jan. 1, 2011 through Dec. 31, 2011), https://www.health.ny.gov/health_care/managed_care/mltc/pdf/map_model_contract.pdf.

38.     The services that MLTCPs provide pursuant to these contracts include long-term care services that enable Medicaid recipients to live safely in their homes that are collectively referred to herein as "home care services."

39.     Home care services include, at a minimum, the personal care services essential to the maintenance of the patient's health and safety in his or her home, which can include preparing meals, assistance with personal hygiene, toileting, walking, and/or other identified tasks. *See* 42 U.S.C. § 1396d(a)(7), (a)(24); 42 C.F.R. § 440.167; N.Y. Soc. Serv. L. § 365-a(2)(e)(i); N.Y. Comp. Codes R. & Regs. tit. 18 § 505.14(a); *see* Centers for Medicare and Medicaid Servs., STATE MEDICAID MANUAL § 4480(C), at 4-495 (1999), *available at* https://www.cms.gov/Regulations-and-Guidance/guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html (describing Medicaid coverage of personal care services).

40.     Home care services also include full or part time nursing, home health aide services, medical supplies, and home-based physical therapy. *See* 42 U.S.C. § 1396d(a)(7); 42 C.F.R. § 440.70; N.Y. Soc. Serv. L. § 365-a(2)(d); N.Y. Comp. Codes R. & Regs. tit. 18 § 505.23.

41.     Defendant Zucker retains the responsibility for ensuring that the rights of Medicaid recipients enrolled in MLTCPs are protected.  42 C.F.R. § 438.100(a)-(d).

42.     To that end, federal law requires Defendant Zucker to supervise the activities of MLTCPs that provide Medicaid-funded services to New Yorkers, including by auditing MLTCPs' records and patient files. *See* 42 C.F.R. §§ 438.66, 438.340(b)(4), 438.416, 438.228(b).

### Section 504 of the Rehabilitation Act

43.      Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), provides that "[n]o otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

8

discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

44.     Medicaid is subject to the requirements of Section 504, because it is a federally funded program.  42 U.S.C. § 1396-1.

45.     The Rehabilitation Act defines an "individual with a disability" as any person who:

> (a)     [has] a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (b)     [has] a record of such an impairment; or
>
> (c)     [is] regarded as having such impairment...

29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1).

46.     Because "unjustified institutional isolation of persons with disabilities is a form of discrimination," the Rehabilitation Act ensures that disabled individuals receive public services in the most integrated settings appropriate.  *See* 28 C.F.R. §§ 41.51(d), 84.4(b)(2); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597, 600-02 (1999).

*The Americans with Disabilities Act*

47.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 *et seq.*, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

48.     The ADA defines a "public entity" as "any department, agency . . . or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).

49.     DOH is a public entity subject to the requirements of Title II of the ADA.

50.     The ADA and the Rehabilitation Act define disability in virtually identical ways.

9

51.     Because "unjustified institutional isolation of persons with disabilities is a form of discrimination," the ADA ensures that disabled individuals receive public services in the most integrated settings appropriate. *See* 28 C.F.R. § 35.130(d); *Olmstead*, 527 U.S. at 597, 600-02.

## FACTS CONCERNING THE CLASS

52.     MTLCPs in New York State are all fully or partially capitated, meaning they receive from Defendant Zucker a fixed amount of funding per enrollee, regardless of the number of hours of home care the MLTCP provides to that individual.

53.     Because of the fixed rate, MLTCPs have an incentive to provide enrollees with fewer hours of care than are medically necessary

54.     Members of the proposed class depend on Medicaid-funded home care services in order to remain safely in their own homes.

55.     They are all disabled as defined by the ADA and Section 504.

56.     In many cases these individuals would need to permanently reside in a Medicaid-funded nursing home or other institution if not for their home care services.

57.     Members of the class are very vulnerable.  By definition, they cannot manage alone. They have multiple chronic conditions, many of which will not improve and which are in fact degenerative, and they require home care services for basic activities of daily living including ambulation, toileting, and cooking.

58.     Prior to 2012, most Medicaid recipients who required home care received that care directly from their local Social Services districts.  The Social Services district would determine the number of home care hours a recipient required and contract with a home care agency to provide an aide for the requisite hours.

59.     As of 2012, most recipients of both Medicare and Medicaid residing in New York State who were eligible for community-based long-term care and were expected to need at least 120 days of such care were required to enroll in a MLTCP.

60.     A few groups of people, including new applicants with immediate needs, continue to receive such services through their local Social Services districts.

61.     Each MLTCP must provide the same package of core benefits.

62.     When Medicaid recipients were required to switch from getting their home care through Social Services districts to getting them through MLTCPs, they had the option to choose their own MLTCP or to let a state contractor named Maximus auto-enroll them in a plan.

63.     For that initial transition, enrollees were provided with specific transition rights. Each enrollee was entitled to keep the same number of hours of care they had received through their Social Services district for at least the first 90 days of their enrollment in an MLTCP.  CMS, Partnership Plan Medicaid Section 1115 Demonstration, Waiver No. 11-W-0114/2, Special Terms and Conditions at 20 (effective from April 1, 2013 through Dec. 21, 2014), *available at* https://www.health.ny.gov/health_care/managed_care/appextension/docs/special_terms_and_conditions_04_2013.pdf.

64.     Once the 90 days elapsed, the MLTCP could reduce the home care hours, but only if it first provided an adequate and timely notice and all attendant Fair Hearing rights.  *See id.*

65.     Medicaid recipients were required to enroll in an MLTCP in order to continue receiving home care, but they did not need to accept a reduction in hours as a condition of that enrollment.

66.     There are approximately 15 to 20 MLTCPs operating in each of the three counties relevant here.

67.     MLTCPs do not provide home care aides directly. They contract with vendor agencies which hire and pay the aides.

68.     Once an individual is enrolled in an MLTCP, her home care hours can only be reduced or terminated pursuant to an adequate and timely notice with attendant Fair Hearing rights. The enrollee is entitled to keep her current hours pending the outcome of the Fair Hearing.  At any Fair Hearing regarding a reduction or termination, the MLTCP bears the burden of proving that the reduction or termination is lawful.

69.     MLTCP enrollees have the right to switch plans at any time.  If an enrollee wants to switch plans, she or he can request an assessment from other plans operating in her area.

70.     In the event of this type of voluntary transfer to a new plan, the new plan does an assessment of the individual's needs, and notifies the individual of what hours the plan believes the individual needs.  The individual can choose to accept those hours and switch plans, or reject those hours and stay in her current plan.

71.     In 2016, an MLTCP named HomeFirst, which had operated in several upstate counties, announced that it was going out of business.

72.     Despite requests from enrollees and their advocates, Defendant Zucker did not provide any transition rights to HomeFirst enrollees who were required to switch to a different MLTCP.

73.     Medicaid advocacy groups repeatedly asked Defendant Zucker to institute a policy requiring that enrollees of a closing MLTCP keep their home care services at their current levels until they had received the timely and adequate notice and attendant administrative hearing rights required for any adverse action.

74.     Now, Elderplan's HomeFirst has announced that it intends to close in Suffolk County imminently, resulting in more Medicaid recipients facing the same problem now faced by GuildNet enrollees.

75.     Defendant Zucker has established no policy that protects enrollees' due process rights when their MLTCPs cease operations.

76.     As a result, when an MLTCP closes, the enrollees of that MLTCP lose their entitlement to the continuation of their benefits, and must reapply for them from other plans.

77.     On November 15, 2016, GuildNet informed Defendant Zucker that it would "not be enrolling any additional members into GuildNet programs in Nassau, Suffolk and Westchester," and would "seek [DOH] assistance in vacating these counties while [GuildNet] consider[s] [its] options for the remainder of GuildNet."  GuildNet Letter to DOH (Nov. 15, 2016), *available at* http://www.nyshcp.org/assets/0/72/300/304/318/15622/aabc779d-47f1-4ccd-ab21-2e3a38d078c8.pdf.

78.      GuildNet MLTC is the largest MLTCP in Suffolk and Nassau Counties, and one of the larger plans in Westchester County.

79.     In March of 2017, GuildNet had 1,990 enrollees in Suffolk County, 35% of the total MLTCP enrollee population for that county of 5,735; it had 1,753 in Nassau County, 27% of the total MLTCP enrollee population for that county of 6,438; and it had 451 enrollees in Westerchester County, 10% of the total MLTCP enrollee population for that county of 4,685.

80.     By contrast, several other plans have fewer than 100 enrollees per county.

81.      In March 2017, GuildNet sent its enrollees in the three counties relevant here a letter advising them that "GuildNet will no longer offer Managed Long Term Care (MLTC) services in [your county] effective June 1, 2017. It is important that you select a new MLTC plan

before May 18, 2017 to assure a smooth transfer to your new plan.  You will continue to receive services from GuildNet until your transfer to your new plan is complete." Ex. A, GuildNet Letter.

82.      The GuildNet letter does not tell enrollees that they have a right to keep their current hours until and unless they are given an opportunity for a Fair Hearing at which to challenge any proposed reduction, whether in GuildNet or in a new MLTCP.

83.      The GuildNet letter does not inform enrollees of what will happen if they have not found a new plan by June 1, 2017.

84.      The GuildNet letter does not explain whether the statement that the enrollee will continue to receive services from GuildNet until transferring to a new plan means only between May 18 and June 1, or for as long as it takes to find a new plan that will maintain the same hours they are receiving from GuildNet.

85.      Upon information and belief, Defendant Zucker approved the March 2017 GuildNet letter in advance of it being sent to enrollees.

86.      Medicaid advocacy groups requested meetings with Defendant Zucker to seek a transition plan for GuildNet enrollees to ensure that they could keep their current hours when they switched to a new MLTCP.

87.      Upon information and belief, at one of those meetings, DOH employees stated that any GuildNet enrollee who switched to a new MLTCP after receiving the GuildNet letter did so "voluntarily."  As a result, the individual was considered to be voluntarily giving up her current hours and accepting whatever home care hours were offered by the new plan.

88.      Upon information and belief, Defendant Zucker has not directed MLTCPs operating in Westchester, Suffolk and Nassau Counties to accept GuildNet enrollees at their current level of home care.

89.     Because there are thousands of GuildNet enrollees seeking to change plans, many other MLTCPs operating in the three counties in question have told GuildNet enrollees that they did not have the capacity to assess them before May 18, 2017.

90.     The Named Plaintiffs and many other putative class members were told that they could not be assessed by some plans prior to the deadline listed in the GuildNet letter.

91.     The Named Plaintiffs and many other putative class members who have been assessed by other MLTCPs have been offered drastically fewer home care hours than GuildNet was providing them.

92.     Individuals who are offered fewer hours by other plans cannot challenge those determinations at Fair Hearings unless they first agree to be enrolled in the new plan with the reduced amount of care.

93.     If they do agree to be enrolled in the new plan and request a Fair Hearing, the issue at the hearing is the alleged "inadequacy" of care as opposed to "reduction," and aid continuing is not available.  This means that they must live with reduced care while they wait for their hearing and subsequent determination.

94.     Additionally, MLTCP enrollees who request a hearing on the adequacy of their care, rather than on a proposed reduction, bear the burden of proving that they need more care at their Fair Hearing.  In a hearing regarding a proposed reduction, on the other hand, the MLTCP bears the burden of proving that the reduction is warranted.

95.     In response to complaints by enrollees and their advocates, on or about May 13, 2017, Defendant Zucker sent a letter to GuildNet enrollees in these counties informing them that they do not need to transfer to a new plan by June 1, and that "the State requires GuildNet to

continue providing your existing services until a smooth transfer can be completed to your new plan of choice." Ex. B, DOH Letter.

96.     Defendant Zucker's letter does not inform enrollees that they have a right to continue to receive their existing services until and unless they are given an opportunity for a Fair Hearing to challenge any proposed reduction or termination.

97.     Defendant Zucker's letter does not inform enrollees when GuildNet is actually closing nor by what date they must choose a new plan.

98.     Defendant Zucker has established no transition plan to ensure that enrollees whose MLTCPs close will continue to receive the level of care they were receiving from their plans until and unless they have the opportunity for a Fair Hearing at which to challenge any proposed reduction in care, whether the care will be provided by the original MLTCP or a new one.

99.     As a result of Defendant Zucker's failure to establish an adequate transition plan, Plaintiffs may be required to accept fewer hours of care to avoid a complete termination of services upon GuildNet's closing.

100.     During this lengthy period of transition, Plaintiffs not only shoulder the burden of finding their own care, but also suffer anxiety as a result of the uncertainty created by Defendant Zucker.

## FACTS CONCERNING NAMED PLAINTIFFS

### *Marie Turano and Leonard Turano*

101.     Marie Turano is a 77 year-old resident of Aquebogue, New York.

102.     Leonard Turano is an 86 year-old resident of Aquebogue, New York.

103.     Marie Turano and Leonard Turano ("the Turanos") are married and live together. No other family members live in their home with them.

104.    The Turanos have two daughters. One lives in New York City and the other lives in Manhasset, New York. Neither are able to visit often.

105.    The Turanos were in an automobile accident on July 21, 2015 that left them both with permanent injuries that make them dependent on home care services.

106.    As a result of the accident, Marie Turano had to undergo seven surgeries, including operations to repair her knees, pelvis, tibia, ribs, hips, and legs.

107.    As a result of the accident, Leonard Turano suffered broken ribs, a broken clavicle, and bruises on bones in his spine.

108.    After staying in the hospital for several months, the Turanos were both transferred to a rehabilitation facility in October 2015.

109.    They returned to live in their home around November 2015.

110.    Due to her injuries, Ms. Turano is no longer able to stand or move around without support. She must use a wheelchair, walker, or crutches to get around her home.

111.    She needs daily assistance with getting out of bed, taking a shower, dressing herself, preparing her meals, taking her medication, and completing basic household chores.

112.    She also requires assistance using lymphedema pumps, which she must use daily on both sides of her body.

113.    She also needs to attend physical therapy three times a week and requires help getting to and from her appointments.

114.    Mr. Turano has trouble walking and must use a cane. He has difficulty keeping his balance and has fallen around the home several times. He is unable to get up without help after he has fallen. He also has difficulty picking things up off the floor.

115.   He needs assistance putting his socks on, drying himself after the shower, and completing basic household chores.

116.   While in the hospital after the accident, the Turanos both applied for Medicaid and were approved on November 1, 2015.

117.   They were both enrolled in GuildNet.

118.   GuildNet first assessed them while they were in the hospital and determined that, as a mutual case, they would need 24 hour care.

119.   GuildNet assigned a 24 hour live-in aide through Serene Home Nursing Agency ("Serene") to provide care for both Ms. and Mr. Turano.

120.   GuildNet reevaluates their care needs approximately every six months and has always found that they require 24 hours of care.

121.   Around March 2017, the Turanos received a letter stating that GuildNet would no longer be operating in their area as of June 1, 2017. The letter directed them to choose a new plan by May 18, 2017 so they could be enrolled by the June 1 deadline.

122.   The letter did not state what would happen if they did not act before May 18, or whether they could keep their current hours.

123.   The Turanos contacted Fidelis, and at their request, were assessed by Fidelis in April 2017.

124.   The nurse who assessed them informed them that Fidelis would only be able to provide them with seven hours of care—four hours for Ms. Turano and three hours for Mr. Turano.

125.   The nurse from Fidelis told them that he recognized they needed more care but that seven hours was the best he could offer at that time.

126.    The Turanos contacted WellCare and on or about May 11, 2017, a nurse from WellCare also assessed the Turanos, at their request.

127.    Even though the nurse acknowledged that they would need more care, she said that WellCare would only be able to provide them with three hours of care because they did not have sufficient staff to provide more hours.

128.    The Turanos contacted  Visiting Nurse Service of New York ("VNSNY") and on or about May 13, 2017, at their request, VNSNY did an assessment of their needs.

129.    VNSNY determined that they required 24 hour care, but that it would not continue Ms. Turano's physical therapy.

130.    Ms. Turano asked the nurse who evaluated her if the nurse could get VNSNY to reconsider.  The nurse told her she would see what she could do, but never got back to her with an answer.

131.    When Ms. Turano called VNSNY to accept the 24 hour care, despite the lack of physical therapy, a VNSNY employee told her that the 24 hours were no longer available to her and that she would need to begin the process again.

132.    Despite multiple calls and e-mails, Ms. Turano has been unable to move forward with her application at VNSNY.

133.    Ms. Turano also contacted North Shore and Aetna, and tried to contact RiverSpring and AgeWell.

134.    An employee at North Shore said they were unavailable to assess her until the end of June and asked her to call back then.

135.    Aetna said that it would be unavailable to evaluate her until August.

136.    RiverSpring and AgeWell never called her back.

137.    Ms. Turano also reached out to CenterLight, Extended MTLC, and HomeFirst. They all informed her that they would not provide services in Suffolk County.

138.    In mid-May 2017, the Turanos received a letter from DOH, stating that they do not need to transfer to a new plan by June 1, 2017. However, the letter does not give them information about what would happen if they cannot find a plan that will meet their existing needs.

139.    Towards the end of May 2017, GuildNet informed the Turanos that GuildNet's contract with Serene will expire on June 15, 2017 and that there is no guarantee that they will be able to keep their current aide.

140.    On or about June 1, 2017, Ms. Turano called her GuildNet care manager asking what would happen after June 15, 2017. Her GuildNet care manager told her that GuildNet was no longer contracting with Serene and that GuildNet would allow other care providers to bid on her case. The care manager did not inform her of what would happen if another provider failed to bid on her case.

141.    To date, the Turanos have been unable to find a plan that will accept them with their current level of care.

142.    The Turanos are not able to live alone without a full-time aide. If an MLTCP does not grant them 24 hour care, they may need to move to a nursing home.

143.    As a result of the threat of losing care, the Turanos are suffering frustration and anxiety.

144.    They are fearful that if they are unable to keep their current level of care, they will be forced to move into an institution.

*Gemma Samele*

145.    Gemma Samele is an 89 year-old resident of Tuckahoe, New York.

146.    She lives alone.

147.    Ms. Samele is completely blind and depends on a wheel-chair to move. She also has atrial fibrillation, low blood pressure, arthritis, and pulmonary disease.

148.    She is unable to walk or stand and cannot get out of her bed without assistance.  Ms. Samele's aides use a sliding board to get her from bed to her wheelchair.

149.    As a result of her blindness and medical conditions, Ms. Samele needs daily assistance with maneuvering around her home, using the bathroom, preparing her medication, and completing all of her basic household chores.

150.    Ms. Samele is able to live in the community only because she receives 24 hour per day in home care.

151.    Ms. Samele has been receiving home care services through GuildNet in the amount of 24 hours per day since 2012. At no time has GuildNet attempted to reduce or terminate her hours or suggested that she needed fewer hours.

152.    In March 2017, Ms. Samele received a letter stating that GuildNet would no longer be operating in her area as of June 1, 2017. The letter directed Ms. Samele to choose a new plan by May 18, 2017 so she could be enrolled by the June 1 deadline.

153.    The letter did not state what would happen if she did not act before May 18, or whether she could keep her current hours.

154.    Ms. Samele's son called the vendor agencies that supply his mother's aides and asked them which other MLTCPs they contract with.  They provided him with three MLTCP options, and of those he called ArchCare Community Life first.

155.    Ms. Samele was assessed by ArchCare Community Life. A nurse at ArchCare Community Life assessed Ms. Samele as needing eight hours of home care services per day. This

is completely inadequate as she cannot be left alone at night or move around her home without assistance.

156.    On May 19, 2017, Ms. Samele's son called Fidelis Care at Home and Elderplan. However, no assessment has been scheduled yet.

157.    On May 19, 2017, Ms. Samele received a letter from DOH, stating that she does not need to transfer to a new plan by June 1, 2017. However, the letter does not give her information about what would happen if there is no plan that will meet her existing needs.

158.    To date, Ms. Samele has been unable to find a plan that will accept her with her current level of care.

159.    If GuildNet closes without Ms. Samele having found a plan that will provide her with 24 hour care, she may need to move to a nursing home.

160.    Ms. Samele is angry and stressed due to the uncertainty of her future care and her ability to remain in her home in the community.

## CLASS ACTION ALLEGATIONS

161.    Named Plaintiffs Marie Turano, Leonard Turano, and Gemma Samele bring this action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class of:

> All individuals who reside in Suffolk, Westchester, or Nassau Counties, and who were enrolled in GuildNet MLTCP as of March 1, 2017.

162.    The class is so numerous that joinder of all class members in this action would be impracticable.  GuildNet provides Medicaid-funded home health care services to approximately 1,990 members in Suffolk County, 1,753 in Nassau County, and 451 in Westchester County.

163.    Moreover, it would be impracticable for potential plaintiffs, who are, by definition, elderly, disabled, and low-income individuals, to obtain legal services on an individual basis for their claims.  Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

164.    Questions of fact common to the class predominate over any individual  questions, including whether Defendant Zucker has failed to create a transition plan to protect enrollees when an MLTCP closes; whether Defendant Zucker is failing to ensure that GuildNet enrollees are given services equal to those they were receiving from GuildNet if they switch plans because of GuildNet's closing, until and unless they are given timely and adequate notice, aid continuing, and an opportunity to challenge any reduction prior to such reduction; whether Defendant Zucker allowed GuildNet to send a letter to its enrollees about its plan to close, even though the letter did not inform enrollees of their right to continue to receive their same level of services, whether through GuildNet or another plan, unless and until they have an opportunity for a Fair Hearing; whether some GuildNet enrollees, alarmed by GuildNet's notice of closing, switched to other plans with lower levels of care, without the opportunity for a Fair Hearing and aid continuing; and whether these actions by Defendant Zucker risk unnecessary instituitionalization of members of the proposed class.

165.    There are questions of law common to the class, including the question of whether the alleged acts of Defendant Zucker violate the rights of members of the proposed class under the Medicaid Act, 42 U.S.C. § 1396 *et seq*., and its implementing regulations; the ADA, 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

166. The claims of Named Plaintiffs Marie Turano, Leonard Turano, and Gemma Samele are typical of the claims of the class in that all of them are GuildNet enrollees who received the March 2017 letter informing them of the plan's closure on June 1, 2017 and the subsequent letter from DOH; none has been able to find an alternative MLTCP that will accept them at their current level of care; and none knows with any certainty that they will have an opportunity to challenge a reduction in or termination of care through a Fair Hearing before they are forced to accept that reduction in or termination of care.

167. Named Plaintiffs will adequately represent the interests of the class. Named Plaintiffs are members of the proposed class and there are no conflicts of interest between Named Plaintiffs and other proposed class members.

168. Named Plaintiffs and all proposed class members would benefit from a declaration that Defendant Zucker has violated the Medicaid Act, the ADA, Section 504, and the Due Process Clause of the Fourteenth Amendment, by allowing GuildNet to send the March notice and by failing to ensure that class members are able to keep their current hours, either from GuildNet, their local Social Services district, or another plan until they receive adequate notice of a reduction and the opportunity for a pre-reduction hearing.

169. Named Plaintiffs and all members of the proposed class would benefit from an injunction ensuring that they continue to receive their current hours of care, until and unless they receive timely and adequate notice and have an opportunity for a Fair Hearing to challenge any proposed reduction in care.

170. Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG"). NYLAG attorneys are experienced in class action litigation concerning Medicaid, including the Medicaid home health services program.

24

## FIRST CAUSE OF ACTION

171.    Defendant Zucker's failure to ensure that, despite GuildNet's threatened or actual closure, Plaintiffs will have their home care benefits continued at their current level until and unless they receive a timely and adequate notice of their right to aid continuing and an opportunity for a Fair Hearing at which to challenge any proposed reduction or termination violates Plaintiffs' rights under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), its implementing regulations, and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## SECOND CAUSE OF ACTION

172.    Defendant Zucker's failure to ensure that Plaintiffs will not have their home care benefits reduced or terminated based on impermissible, non-individualized criteria when GuildNet terminates or threatens to terminate its services in their counties of residence violates Plaintiffs' substantive due process rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution to be free from arbitrary, irrational, and capricious government decisions.

## THIRD CAUSE OF ACTION

173.    Defendant Zucker's failure to ensure that Plaintiffs maintain their home care hours during an involuntary transfer to a new MLTCP or GuildNet's closure threatens to result in unnecessary institutionalization of class members, in violation of their right to receive services in the most integrated setting appropriate to their needs as guaranteed by Title II of the ADA, 42 U.S.C. § 12131, *et seq*., and its implementing regulations, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter judgment as follows:

1.    Certifying this case as a class action, pursuant to Rules 23(a) and (b)(2) of the

Federal Rules of Civil Procedure, with a class defined as:

> All individuals who reside in Suffolk, Westchester, or Nassau counties, and who were enrolled in GuildNet MLTCP as of March 1, 2017.

2.  Declaring that:

    a.  Defendant Zucker's failure to ensure that Plaintiffs will have their home care benefits continued at their current level until and unless they have timely and adequate notice of their right to aid continuing and an opportunity for a Fair Hearing at which to challenge any proposed reduction or termination, regardless of when GuildNet closes or Plaintiffs enroll in a new plan, violates Plaintiffs' rights under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), its implementing regulations, and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

    b.  Defendant Zucker's failure to ensure that Plaintiffs will not have their home care benefits reduced or terminated based on impermissible, non-individualized criteria when GuildNet terminates its services in their counties of residence violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

    c.  Defendant Zucker's failure to ensure that Plaintiffs maintain their home care hours during an involuntary transfer to a new MLTCP threatens to result in unnecessary institutionalization of class members, in violation of their right to receive services in the most integrated setting appropriate to their needs as guaranteed by Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, and its implementing regulations, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.

3.     Permanently enjoining Defendant Zucker

     a.     to ensure that Plaintiffs will have their home care benefits continued at their current rate until and unless they receive a timely and adequate notice, of their right to aid continuing, and to have an opportunity for a Fair Hearing at which to challenge any proposed reduction or termination, regardless of when GuildNet closes or Plaintiffs enroll in a new plan;

     b.     to ensure that class members who have already switched to new MLTCPs as a result of GuildNet's March 2017 letter and are receiving fewer hours of care than they received from GuildNet be restored to the home care hours they previously received while enrolled in GuildNet until and unless they are provided with a timely and adequate notice and an opportunity for a Fair Hearing at which to challenge the reduction;  and

     c.     to ensure that GuildNet provides continuous coverage to its enrollees at their current level of care, without interruption, until they transition to a new MLTCP that also provides the same level of care.

4.     Award reasonable attorney's fees under 42 U.S.C. § 1988(b), 29 U.S.C. § 794a(b), and 42 U.S.C. § 12205.

5.     Award costs and disbursements.

6.     Grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated: New York, New York
June 6, 2017

**NEW YORK LEGAL
ASSISTANCE GROUP
BETH GOLDMAN, ESQ.**

By:

Jane Greengold Stevens, of counsel
Elizabeth Jois, of counsel
Ben Taylor, of counsel
Stewart Dearing, of counsel

7 Hanover Square, 18th Floor
New York, NY 10004
Telephone: (212) 613-5000
Facsimile:  (212) 750-0820
Email:  jstevens@nylag.org
Email:  ejois@nylag.org
Email: btaylor@nylag.org
Email: sdearing@nylag.org

*Attorneys for Plaintiffs*