**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
GEMMA SAMELE, SELMA ROHER *by her*
*next friend MELANIE ROHER*, and
SALVATORE GUADAGNA, *individually and*
*on behalf of all persons similarly situated*,

                            Plaintiff(s),

                  -against-

HOWARD ZUCKER, *as Commissioner of the*
*New York State Department of Health*,

                       Defendant.
-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:17-cv-03397 (ADS)(AKT)

**APPEARANCES:**

**New York Legal Assistance Group**
*Attorneys for the Plaintiffs*
7 Hanover Square
18th floor
New York, NY 10004
    By:    Benjamin Wait Taylor, Esq.,
             Elizabeth A. Jois, Esq.,
             Julia Grossman Russell, Esq.,
             Jane Greengold Stevens, Esq., Of Counsel

**Office of the New York State Attorney General**
*Attorneys for the Defendant*
200 Old Country Road
Suite 460
Mineola, NY 11501
    By:    Dorothy O. Nese, Assistant Attorney General

**SPATT, District Judge**:

      The Plaintiffs Gemma Samele ("Samele"), Selma Roher ("Roher"), And Salvatore

Guadagna ("Guadagna") (the "Plaintiffs") commenced this putative class action against the

Defendant Howard Zucker ("Zucker," or the "Commissioner"), as Commissioner of the New

York State Department of Health ("DOH"), alleging that the Defendant violated the Medicaid

Act 42 U.S.C. § 1396 *et seq.*; the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

Presently before the Court is a motion to dismiss by the Defendant pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 12(b)(1) and Rule 12(b)(6), as well as a motion by the Plaintiffs to certify the case as a class action pursuant to Rule 23. For the following reasons, the Defendant's motion is granted in part and denied in part, and the Plaintiffs' motion is denied without prejudice with leave to renew.

## I. BACKGROUND

### A. The Relevant Facts

The Plaintiffs are all Medicaid and Medicare recipients, and current or former enrollees of GuildNet, a New York State managed long-term care plan ("MLTCP"), that provides home care services throughout New York State.

The Commissioner required the Plaintiffs to enroll in a MLTCP in order to receive long-term services funded by Medicaid.

On or about March 20, 2017, GuildNet sent a letter (the "March 2017 Letter") informing its enrollees in Nassau, Suffolk, and Westchester counties that it would not be offering managed long term care ("MLTC") services beginning June 1, 2017. Enrollees were told that they should select a new MLTCP before May 18, 2017 to assure a smooth transition, and that they would continue to receive services from GuildNet until the transfer to the new plan was complete.

The Plaintiffs allege that the DOH did not require other MLTCPs to offer the same level of care that they had received from GuildNet, or to provide notice before reducing care.

The Commissioner apparently received a number of complaints from GuildNet enrollees about the March 20 Letter, and in May 2017, Zucker sent a new letter to GuildNet enrollees (the "May 2017 Letter") advising them that they did not need to transfer to a new plan by June 1. The Commissioner's letter further stated that

> the State requires GuildNet to continue providing your existing services until a smooth transfer can be completed to your new plan of choice. You can contact New York Medicaid Choice (NYMC) for information about plans available to you and assistance with enrolling in a new plan. All plans provide the same core services and benefits.

(Ex. B. to Am. Compl.).

Samele received 24-hour home care services from GuildNet since 2012. After Samele received the March 20 Letter, her son began looking for an MLTCP that would provide her with the same level of care as GuildNet. On September 1, 2017, Samele enrolled in Elderplan HomeFirst ("Elderplan"), which agreed to provide her with 24-hour home care. Elderplan apparently closed in several counties in 2016, and announced that it intends to close in Suffolk County "imminently." (Am. Compl. ¶ 180). Samele has received 24-hour home care since the March 20 Letter.

Roher received 24-hour home care from GuildNet beginning in October 2016. After she received the March 20 Letter, her daughter contacted other MLTCPs. On or about November 1, 2017, Roher enrolled in Wellcare, which offered her 24 hour home care. Roher has received 24-hour home care since the March 20 Letter.

Guadagna received 24-hour live-in care, as well as Adult Day Health Care ("ADHC"). He attended the Adult Day Health Care program one day a week, and received medical model adult day health services, including physical therapy, occupational therapy, and a bath. After receiving the March 2017 Letter, Guadagna's daughter reached out to MLTCPs to find one that

would offer the same services as GuildNet.  At the time, he was temporarily residing in a rehabilitation center where he was recovering from an episode of gout.  On May 1, 2017, he enrolled in Northwell.  Northwell offered Guadagna 24-hour live-in care, but did not approve his ADHC services.  As a result, Guadagna came home from the rehabilitation center on or about May 1, 2017.  Guadanga has not received occupational therapy or physical therapy since he transferred to Northwell, and has not had a proper bath or shower since that time.  On November 1, 2017, Guadanga transferred to Agewell.  Agewell also agreed to provide 24-hour care, but did not agree to provide ADHC services.  On December 19, 2017, the Commissioner sent a letter to Guadagna informing him that it had directed Agewell to restore his services to the level he received from GuildNet.  The services would have to continue for 120 days, or until he agreed to a new plan of care.

On September 22, 2017, after the Plaintiffs initiated this action, the Commissioner issued MLTC Policy 17.02: MLTC Plan Transition Process—MLTC Market Alteration (the "Transition Policy"), which updated the DOH's transition policy.  The Transition Policy was sent to all MLTCP providers in New York State, and was posted on the DOH website.

Pursuant to the Transition Policy, MLTCPs must send notices to affected consumers when they intend to discontinue operations.  The notices must list available plans; a direction to select a new plan within sixty days of the date of the letter; and state that any enrollee who does not select a new plan within that time frame will be automatically assigned to a new MLTCP.  The DOH will review notices prior to their transmittal, and will require Maximus, a DOH contractor, to send out additional notices to affected enrollees to help them select a new MLTCP.  The new MLTCP must provide enrollees with the same level of services that they previously

received for 120 days. During that 120 days, the MLTCP must conduct a new assessment of the enrollee to determine their plan and services.

On September 25, 2017, Maximus began sending "Outreach Letters" to affected GuildNet enrollees. The Outreach Letters were drafted by the DOH. The first Outreach Letter told current GuildNet members who were concerned about maintaining their current service levels to remain with GuildNet until the Transition Policy is in place. As to those former GuildNet enrollees who were receiving fewer services with a new MLTCP than they had with GuildNet, the letter instructed them to contact New York Medicaid Choice ("NYMC") within ninety days. NYMC would then determine whether those individuals were eligible to have their previous services restored. Individuals would be so eligible if they left GuildNet after March 20, 2017; were still eligible for Medicaid; and received fewer hours of care and services from their current MLTCP than they had under GuildNet.

On October 16, 2017, Maximus sent the second Outreach Letter to individuals who were still enrolled in GuildNet. The letter stated that the DOH had finalized the Transition Policy. GuildNet enrollees had sixty days to select a new MLTCP. If they did not select a new plan by December 15, 2017, one would be selected for them, and their enrollment would be effective on January 1, 2018. The new MLTCP would provide the same level of services for 120 days after the transfer date, unless the enrollee and the plan agreed to a different plan before that time. The letter included a list of MLTCPs available in the Medicaid recipient's area, and told the recipient to call NYMC to select an MLTCP.

On November 30, 2017, Maximus sent the third Outreach Letter to affected current and former GuildNet enrollees. The third Outreach Letter referenced the first two Outreach Letters and reminded current and former GuildNet enrollees of their rights to maintain the levels of care

they received from GuildNet, and of the impending deadlines outlines in the first two Outreach Letters.

## B. Procedural History

On June 6, 2017, Samele, along with former Plaintiffs Marie Turano and Leonard Turano, commenced this action by filing a complaint. The original complaint alleged violations of the Medicaid Act, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the ADA, and the Rehabilitation Act. The original complaint sought an order certifying the action as a class action; declaratory and injunctive relief; costs; and attorneys' fees.

On August 3, 2017, the Defendants filed an answer to the original complaint.

On August 31, 2017, the original Plaintiffs filed a motion to amend the complaint pursuant to Rule 15 to add additional Plaintiffs and additional facts. On November 4, 2017, the Court granted the Plaintiffs' motion to amend their complaint.

The amended complaint added Roher and Guadagna as Plaintiffs. The amended complaint alleged the same violations as the original complaint, and sought the same types of relief. Specifically, the Plaintiffs seek an order declaring that the Commissioner's failure to ensure that the Plaintiffs would have their long-term benefits maintained at current levels unless and until they have notice and a fair hearing to challenge any proposed reduction or termination violates the Medicaid Act and the Due Process Clause; the Commissioner's failure to ensure that Plaintiffs would not have their long-term care benefits reduced or terminated based on non-individualized criteria when GuildNet terminates its services in their counties violates the Due Process Clause; and that his failure to ensure that Plaintiffs maintain their long-term care benefits during an involuntary transfer to a new MLTCP threatens to result in unnecessary institutionalization of class members, in violation of the ADA and the Rehabilitation Act.

To that end, the Plaintiffs seek an order enjoining the Defendant to ensure that the Plaintiffs continue to receive long-term care benefits at their current levels unless and until they receive notice and a fair hearing to challenge any proposed reduction or termination; to ensure that class members who are former GuildNet enrollees currently receiving fewer services than they received from GuildNet be restored their previous levels of care unless and until they are provided with notice and a fair hearing to challenge the reduction; and to ensure that GuildNet provides continuous coverage to its enrollees at their current level of care until they transition to a new MLTCP that provides the same level of care.

On November 21, 2017, former Plaintiffs Marie Turano and Leonard Turano voluntarily dismissed their claims against the Defendants pursuant to Rule 41(a)(1)(A)(ii), and they were removed as Plaintiffs from the action.

On December 1, 2017, the Plaintiffs filed their motion for class certification pursuant to Rule 23.

On December 21, 2017, the Defendants filed their motion to dismiss for lack of jurisdiction pursuant to Rules 12(b)(1) and 12(b)(6).

## II. DISCUSSION

Although the Defendant's motion to dismiss was made by cross-motion, it will be addressed first, since a disposition in the Defendant's favor would render the Plaintiffs' motion for class certification moot.

### A. As to the Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

#### 1. The Parties' Arguments

The Defendant contends that Samele and Roher's claims are not ripe for review because they have not suffered an injury in fact in that their services were never terminated or reduced.

Further, the Commissioner argues that all of the Plaintiffs' claims are moot because the Plaintiffs have already been given all of the relief that they seek because the series of letters sent by the DOH and Maximus state that all GuildNet enrollees must receive the same level of care when they transfer to a new MLTCP for 120 days.

On the other hand, the Plaintiffs assert that all of the Plaintiffs' claims are ripe, and that the Plaintiffs therefore have standing, because the DOH never sent a constitutionally and statutorily mandated notice to the Plaintiffs. The Plaintiffs contend that the Commissioner's failure to send such a notice, and the Plaintiffs' risk of having their services reduced or being institutionalized, constitute an injury in fact. As to the Defendants' mootness argument, the Plaintiffs contend that their claims are not moot because the DOH did not send a notice to GuildNet enrollees who lost care, and has not mandated that such notices be sent when an MLTCP intends to discontinue service in an area.

### 2. The Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(1), a court must dismiss a claim if it "lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.,* 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd,* 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010).

"The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir. 2005).

In deciding a Rule 12 motion to dismiss, the Court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Morrison,* 547 F.3d at 170 (quoting *Natural Res. Def. Council v. Johnson,* 461 F.3d 164, 171 (2d Cir. 2006) (citation

and internal quotation marks omitted)), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *id.* (quoting *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003)).  In deciding the motion, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits."  *J.S. ex rel. N.S. v. Attica Cent. Schs.,* 386 F.3d 107, 110 (2d Cir. 2004); *see also Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

### 3.  The Relevant Law as to Standing

Article III, Section 2 of the Constitution limits federal jurisdiction to actual cases and controversies.  U.S. CONST. ART. III § 2.  It is well-established that:

> the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (internal citations and quotation marks omitted).

Apart from the constitutional requirements, plaintiffs must also meet prudential standing requirements.  Pursuant to those requirements, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179,

185 (2d Cir. 2001) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)).

### 4. Medicaid

Medicaid is a program designed to provide medical assistance to needy persons, and is operated jointly by the federal government and the states. 42 U.S.C. § 1396 *et seq.* States that participate in Medicaid must comply with the requirements set out in federal law and the accompanying regulations to be eligible for federal funding. 42 U.S.C. §§ 1396a, 1396c. Federal law requires that states administer Medicaid through a single state agency. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1).

The New York State Department of Health administers Medicaid in New York. Pursuant to a waiver under Section 1115 of the Social Security Act, New York operates a Medicare managed care program under an approved "Partnership Plan" with the Centers for Medicare and Medicaid Services of the United States Department of Health & Human Services ("CMS"), which allows New York to require most Medicaid beneficiaries to enroll in a managed care organization ("MCO") with which DOH has contracted. MCOs are privately-owned and operated health insurance entities which contract with state Medicaid programs to provide covered services to Medicaid recipients in exchange for payment by the State. 42 U.S.C. § 1396b(m); 42 C.F.R. §§ 438.2, 438.6. Any Medicaid services provided through an MCO must be provided in accordance with a contract between the State and the MCO. 42 U.S.C. § 1396b(m).

The DOH requires medical assistance recipients aged 21 and over who require community-based long-term care services for more than 120 days to enroll in an MLTCP. N.Y. PUB. HEALTH LAW § 4403-f(7)(b). MLTCPs must provide or arrange for health and long-term

care services and care management to its enrollees directly or through subcontractors. *Id.* at § 4403f(1)–(3).

Enrollees have a right to be notified by an MLTCP when a plan decides to deny, discontinue, suspend, or reduce medical assistance authorization or services, 42 U.S.C. § 1396a(a)(3)–(4); 42 C.F.R. §§ 431.206(b)-(c), 431.210, 431.211, 438.210(c)-(d), 438.400, 438.404, and have a right to an administrative fair hearing when Medicaid benefits are denied, reduced, or terminated. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.220, 438.402.

The notice required by federal law must explain the proposed action by the MLTCP; the reasons for taking such proposed action; the enrollee's right to a fair hearing; and the right to "aid continuing," which means that the enrollee must be provided with the same level of services until the outcome of the fair hearing. 42 C.F.R. §§ 431.206, 431.210, 438.404. Such notice must be sent to Medicaid recipients at least ten days before the proposed action. *Id.* at §§ 431.211, 438.404(c)(1).

Federal law requires the state agency administering Medicaid to "arrange for Medicaid services to be provided without delay to any Medicaid enrollee of an MCO, PIHP, PAHP, PCCM, or PCCM entity the contract of which is terminated and for any Medicaid enrollee who is disenrolled from an MCO, PIHP, PAHP, PCCM, or PCCM entity for any reason other than ineligibility for Medicaid." 42 C.F.R. 438.62.

On May 6, 2016, CMS adopted a final rule, after notice and comment, "moderniz[ing] the Medicaid managed care regulations to reflect changes in the usage of managed care delivery systems." Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability, 81 FR 27498-01. The rule, *inter alia*,

proposed to add a standard to § 438.62(b) which would require that states have a transition of care policy in place for individuals moving to managed care from FFS, or from one MCO, PIHP, PAHP, PCCM, or PCCM entity to another when an enrollee without continued services would experience serious detriment to their health or put them at risk of hospitalization or institutionalization. Under this proposal, states would define the transition policy, as long as it met the standards proposed in paragraph (b)(1), and would have the flexibility to identify the enrollees for which the MCOs, PIHPs, PAHPs, PCCMs, or PCCM entities would need to provide transition activities. Paragraph (b)(1) proposed that state transition policies include: Permitting the enrollee to continue to receive the services they are currently receiving from their current provider for a specified period of time in paragraph (b)(1)(i); referring the enrollee to an appropriate participating provider in paragraph (b)(1)(ii); assuring that the state or MCO, PIHP, or PAHP comply with requests for historical utilization data in paragraph (b)(1)(iii); and assuring that the enrollee's new provider is able to obtain appropriate medical records in paragraph (b)(1)(iv).

*Id*. at 27639. The revised regulation applies to the rating period for contracts beginning on or after July 1, 2018, *id*. at 27872, and the implementation date is April 1, 2019.

### 5. Application to the Facts

#### a. As to Whether Samele and Roher Suffered Injuries in Fact

The Defendant contends that Samele and Roher had not suffered an injury in fact at the time that the suit was commenced because, at that time, they had not enrolled in an MLTCP with less coverage, and had not been forced into a nursing home or some other less restrictive environment. The Plaintiffs argue that Samele and Roher suffered injury in fact when they were refused the same level of care by other MLTCPs without notice of their right to a fair hearing after they were forced to leave GuildNet. The Court finds that Samele and Roher have not suffered an injury in fact.

First, the Court notes that the relevant date for measuring whether a plaintiff has standing is the date on which the suit commenced. *United States Parole Commission v. Geraghty,* 445 U.S. 388, 397, 100 S. Ct. 1202, 1209, 63 L. Ed. 2d 479 (1980) ("The requisite personal interest

that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (internal citation and quotation marks omitted)).

At the time that the suit was commenced, June 6, 2017, Samele had not yet enrolled in a new MLTCP. In fact, although she had been assessed by ArchCare Community Life, ArchCare assessed that Samele only needed eight hours of home care services per day. At that time, her son had also reached out to Fidelis and Elderplan, but assessments had not yet been scheduled. Samele alleged that if she did not receive 24 hours of home care, she would possibly have to move to a nursing home.

When the Plaintiffs sought leave to allow Roher to join the suit, August 31, 2017, two MLTCPs assessed that she required less than twenty-four hours of care per day. When Roher's daughter asked one of the MLTCPs if she could appeal the assessment, she was apparently told that she had to accept or reject the offer.

However, in May, both Samele and Roher received the Commissioner's letter which stated that GuildNet would have to continue providing existing services to them until they transitioned to a new plan.

Neither Samele nor Roher had their benefits reduced, suspended, or terminated. As such, they were not entitled to notice or a fair hearing. At the time they each joined the suit, they were still receiving the same level of care from GuildNet that they had always received, and were informed by the Commissioner that they would be receiving the same level of care from GuildNet until they transitioned to a new plan. Therefore, they did not suffer an injury in fact. As the Court holds below, had they enrolled in one of the plans that offered less care without notice and hearing, they would have suffered an injury in fact. However, since they did not so enroll, they do not have standing.

The Plaintiffs contend that they should have been afforded notice of their right to a fair hearing and aid continuing when they were assessed for less care than they received under GuildNet. In the Court's view, this assertion is contrary to the statute and regulations, and is unworkable.

Under the regulations, individuals are entitled to notice "[a]t the time the agency denies an individual's claim for eligibility, benefits or services; or denies a request for exemption from mandatory enrollment in an Alternative Benefit Plan; or takes other action, as defined at § 431.201; or whenever a hearing is otherwise required in accordance with § 431.220(a)." 42 C.F.R. § 431.206(c)(2). The regulations define action as, *inter alia*, "a termination, suspension of, or reduction in covered benefits or services . . . ." *Id.* at § 431.201. Particularly relevant here, the "[d]ate of action means the intended date on which a termination, suspension, reduction, transfer or discharge becomes effective." *Id.*

Neither Samele nor Roher ever had their benefits terminated, suspended or reduced. The MLTCPs did not have to send notice of their right to a fair hearing with aid continuing to those Plaintiffs because they had not enrolled in those plans, and therefore there was no date certain when Samele and Roher would have their benefits reduced.

Furthermore, the Plaintiffs' proposition that MLTCPs provide notice and a fair hearing anytime they are assessed for less care than they previously received is unworkable. For instance, Roher's daughter contacted five different MLTCPs after GuildNet sent their initial notice. Under the Plaintiffs' asserted interpretation of the statute and regulations, all five would have had to offer Roher notice and a fair hearing even though she was not yet enrolled with any of the plans. Conversely, if two offered fewer services than GuildNet had, but three offered the same as or more than GuildNet, the two that offered less would still have to provide notice and a

fair hearing even if Roher had enrolled with one of the other three because the two that offered her less care would be unaware that other MLTCPs were offering a higher level of care.

In that way, neither Samele nor Roher were at risk of losing their care. Instead, at the time they each joined the action, the risk was hypothetical or conjectural. This stands in contrast to the situations present in the cases cited by the Plaintiffs.

In *Menking ex rel. Menking v. Daines*, 287 F.R.D. 174 (S.D.N.Y. 2012), where a plaintiff sought to bring a putative class action on behalf of those who had not had their fair hearings within the required statutory period, the Court found that she had standing, but relied on an injury separate and apart from the prospect of the plaintiff losing her care. Specifically, the Court found that the plaintiff had suffered an injury as a result of unlawful administrative delays. The Court said that

> excessive administrative delays that cause a deprivation of Medicaid benefits . . . constitute injury in and of themselves, even if Plaintiff Menking never suffered any denial of medical care prior to filing her complaint. Unlawful administrative delays constitute an injury that the plaintiffs were likely to suffer during the fair hearing resolution process. Nothing more is needed for purposes of the Constitutional standing requirement.

*Id.* at 179 (quoting *Shakhnes ex rel. Shakhnes v. Eggleston,* 740 F. Supp. 2d 602, 632 (S.D.N.Y. 2010), *aff'd in part, vacated and remanded on other grounds* 689 F.3d 244 (2d Cir. 2012) (internal quotation marks and alterations omitted)).

In *Mayer v. Wing*, 922 F. Supp. 902 (S.D.N.Y. 1996), the plaintiffs received notice that their levels of Medicaid services were being reduced. While the Court did state that "[t]he fact that none of the Plaintiffs was experiencing a reduction of services on the date the complaint was filed is of no moment," *id.* at 906, the Court relied on the fact that the plaintiffs faced the imminent prospect of reduced services pending a hearing. Furthermore, the Court noted that even if an actual reduction in services was necessary to show injury, three of the named plaintiffs

and intervenors had previously suffered a reduction in services, and there was a substantial likelihood that it would reoccur. *Id.* at 907.

Similarly, in *Strouchler v. Shah*, 891 F. Supp. 2d 504 (S.D.N.Y. 2012), the plaintiffs received notice that their benefits were being reduced or terminated. While the Court found that the plaintiffs demonstrated a likelihood of irreparable harm because, inter alia, "the mere *threat* of a loss of medical care, even if never realized, constitutes irreparable harm," *id.* at 522 (citing, *inter alia*, *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004); *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979)), the plaintiffs in *Strouchler*, unlike Samele or Roher, were told that their benefits were being reduced or terminated.

Here, in contrast, neither Samele nor Roher faced such the imminent prospect or even the threat of loss of medical care. Pursuant to the Commissioner's May 2017 letter, GuildNet had to continue providing the same level of care to them until they found a new provider. The letter even said that enrollees "may remain in GuildNet and continue to receive your existing levels of service until you have found a plan that meets your needs and the enrollment transfer can be arranged." (Ex. B to Am. Compl.). While several MLTCPs had assessed that Samele and Roher required less care than previously offered by GuildNet, they were free to seek out other MLTCPs who would offer the same level of care. Indeed, both Samele and Roher were eventually offered 24-hour care by different MLTCPs.

For those same reasons, neither Samele nor Roher were in danger of being institutionalized.

Therefore, Samele and Roher did not suffer injuries in fact, and they do not have standing. Accordingly, the Defendant's motion to dismiss their claims pursuant to Rule 12(b)(1) is granted. In any event, as discussed below, their claims are moot.

However, as the Defendant seemingly concedes, Guadagna does have standing. Indeed, the Court finds that when Guadagna enrolled in Agewell, and received less care than he had received under GuildNet without notice of a right to a fair hearing with aid continuing, he suffered injury. The Court notes that the Defendant's silence on Guadagna's standing seemingly contradicts their position that an MLTCP need not provide notice of a right to a fair hearing when an enrollee decides to switch to their plan and receive less care. By conceding Gaudagna's standing, the Commissioner seemingly admits that AgeWell should have afforded notice of a right to a fair hearing when they provided him with less care than he received under GuildNet.

This finding is consistent with one of the Decisions After Fair Hearing cited by the Plaintiffs, In the Matter of the Appeal of [redacted] from a determination by the Nassau County Department of Social Services, Fair Hearing No. 7584246R (Nassau, Aug. 2, 2017), available at http://otda.ny.gov/fair%20hearing%20images/2017-10/Redacted_7584246R.pdf. (last visited June 6, 2018). In that case, the 97-year-old appellant sought coverage from Integra after she was told that GuildNet would no longer be offering services in her area. The appellant had received 24-hour live-in services while enrolled in GuildNet. On April 6, 2017, Integra assessed that the appellant should receive 43 hours of live-in services per week. On May 1, 2017, Integra authorized 56 hours per week of live-in care, and the appellant enrolled the same day. On August 2, 2017, the appellant requested a fair hearing. On August 23, 2017, Integra issued a notice to the appellant advising her that her request for 24-hour care was denied, and that her care would remain at 56 hours per week.

Relevant here, the Commissioner's Designee determined after the hearing that the assessment and the limited authorization of service constituted an action that gave the Commissioner jurisdiction to review the matter. Specifically, the decision states:

At issue is the Plan's determination based on its nurse's assessment of April 6, 2017 to grant the Appellant, age 97, a [personal care services] authorization in the amount of 56 hours per week (8 hours per day, 7 days per week), even though Appellant's representative had sought and requested a 24-hour live-in [personal care services] authorization for the Appellant. . . . The Plan's nurse assessment and Tasking Tool of April 6, 2017, as well as the Plan's internal email communication of April 7, 2017, submitted at the hearing, indicate that the Plan was then on notice that Appellant's representative was seeking a 24-hour live-in PCS authorization from the Plan, yet the Plan approved only 56-hour weekly PCS authorization effective May 1, 2017; i.e. the date of Appellant's enrollment in the Plan. In accordance with the applicable Regulations set forth above, the Plan's limited authorization of service constitutes an "action" and the Commissioner has jurisdiction to review same as well as the adequacy of the Plan's service authorization. The fact that the Plan has not issued an official written determination regarding such authorization at the time of the fair hearing request does not bar the Commissioner from reviewing same.

*Id*. at 18. The Commissioner's Designee determined that Integra took an adverse action by authorizing fewer hours than previously provided by GuildNet, and sought by the appellant.

In the same way, Guadagna suffered injury when AgeWell authorized him for less care than he received from GuildNet, and was not provided with notice of a right to a fair hearing. Therefore, Guadagna had standing to bring his claims at the time he commenced this action.

### b. As to Whether the Plaintiffs' Claims Are Moot

The Defendant contends that all of the Plaintiffs' claims are moot, because the Commissioner has already provided all of the relief that they seek. Specifically, the Commissioner states that since the letters and Transition Policy force MLTCPs to accept enrollees at their previous levels of care when another MLTCP closes, the Plaintiffs' claims are moot. On the other hand, the Plaintiffs argue that the DOH has not eliminated the harm because the Transition Policy does not state that MLTCPs accepting enrollees from closing MLTCPs must provide notice of a right to a fair hearing when they assess and authorize them for a lower standard of care; the Plaintiffs' claims are capable of repetition yet evading review, and inherently transitory; and that the Defendant has not met its burden in mooting the case due to

18

voluntary cessation. The Court finds that although the named Plaintiffs' claims have been mooted, the nature of claims such as Guadagna's are inherently transitory, and therefore the putative class action claims survive.

Standing and mootness are interrelated concepts, but are not to be confused. Standing relates to whether a litigant has a personal stake at the commencement of an action, while mootness ensures that the litigant's interest exists "throughout the life of the lawsuit." *Comer v. Cisneros*, 37 F.3d 775, 797–98 (2d Cir. 1994) (internal citations and quotation marks omitted).

"[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Cty. of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969) (internal quotation marks omitted)).

Special concerns exist with regard to class action mootness. "[I]n general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." *Comer,* 37 F.3d 798. But if the class is certified before the named plaintiff's claims become moot, he may continue to represent the class, even though his own claims later becomes moot. *See, e.g., Cty. of Riverside v. McLaughlin,* 500 U.S. 44, 51-52, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991); *Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S. Ct. 854, 861 n.11, 43 L. Ed. 2d 54 (1975);

There are three exceptions to the general rule that the mooting of a named plaintiff's claims moots a class action: (a) the defendant voluntarily ceases the injury-causing conduct in an attempt to evade judicial scrutiny, *Davis,* 440 U.S. at 631; (b) the claims are inherently transitory, *Sosna v. Iowa,* 419 U.S. 393, 399-400, 95 S. Ct. 553, 558, 42 L. Ed. 2d 532 (1975); or

(c) the claims are capable of repetition, yet evading judicial review, *Comer,* 37 F.3d at 798. The Plaintiffs claim that each of the exceptions are applicable here.

### 1. Voluntary Cessation

In order to determine whether voluntary cessation of conduct moots a controversy, a defendant must show 1) that the conduct has, "in fact, ceased," *Am. Freedom Defense Initiative v. Metro. Trans. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016); 2) that there is "no reasonable expectation that the alleged violation will recur," *id.* (internal quotation marks omitted); and finally, that the "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *id.* (internal quotation marks omitted).

The Defendants' burden is "heavy," *id.* at 110, especially because "exceptions to mootness" such as the voluntary cessation doctrine "are particularly applicable in class action cases in the . . . civil rights arena." *Jobie O. v. Spitzer*, No. 03-cv-8831, 2007 WL 4302921, at *13 (S.D.N.Y. Dec. 5, 2007). Despite that "general proposition," the mootness inquiry is "intensely factual." *Id.*

As an initial matter, the Court finds that the Defendant has, in fact, provided the relief sought by the Plaintiffs. That is, the Defendant's conduct which serves as a basis for this lawsuit has ceased. By mandating that receiving MLTCPs accept enrollees at their previous levels of care, the DOH has ensured that the Plaintiffs and those similarly situated continue to receive their care at the levels previously provided by GuildNet. Furthermore, contrary to the Plaintiffs' contentions, the Transition Policy also ensures that anyone who is forced off of one MLTCP to another due to closure will receive notice of a right to a fair hearing if they are assessed to require less care. Since the enrollees will receive their previous levels of care by the receiving MLTCPs before they are reassessed, any assessment finding that the enrollee requires less care

would have to be accompanied by notice of a right to a fair hearing with aid continuing. 42 U.S.C. § 1396a(a)(3)–(4); 42 C.F.R. §§ 431.206(b)-(c), 431.210, 431.211, 438.210(c)-(d), 438.400, 438.404. As the MLTCPs are already bound by statute and regulation to provide notice to enrollees when they take action, the Transition Policy did not need to reiterate it. Therefore, the Commissioner has provided the relief sought by the Plaintiffs.

Second, the Court finds that there is no reasonable expectation that the alleged violation will recur. The DOH issued the Transition Policy in response to CMS' amending of 42 C.F.R. 438.62. Relevant here, the amendment requires states to have "a transition of care policy to ensure continued access to services during a transition from [one Medicaid provider to another] when an enrollee, in the absence of continued services, would suffer serious detriment to their health or be at risk of hospitalization or institutionalization." 42 C.F.R. § 438.62(b). The transition of care must provide, *inter alia*, that "[t]he enrollee has access to services consistent with the access they previously had, and is permitted to retain their current provider for a period of time . . . ." *Id.* at § 438.62(b)(1)(i).

While the Plaintiffs are correct that the Defendant's Transition Policy was not issued pursuant to notice and comment, they are incorrect that the DOH could change its policy in the future. This is because the Transition Policy is the state's answer to 42 C.F.R. § 438.62, which *was* issued pursuant to notice and comment. If the DOH changed its policy in the future, it would not be in compliance with the federal regulation requiring such a transition policy. Therefore, as the Code of Federal Regulations requires that states ensure that enrollees are permitted to receive their previous levels of care when they transition between Medicaid providers, the Court finds that there is no reasonable expectation that the alleged violation will continue.

"Defendants have shown that there is no reasonable expectation that the old time policy will recur. Indeed, the new rule was adopted after a public hearing and comment period. Such rules—while not as undoable as legislation have often been considered sufficiently concrete as to satisfy this element of the voluntary cessation doctrine." *Bryant v. City of New York*, No. 14-CV-8672 (SHS), 2016 WL 3766390, at *4 (S.D.N.Y. July 8, 2016) (internal citations and quotation marks omitted); *see also Holland v. Goord*, 758 F.3d 215, 223 (2d Cir. 2014) (finding that the plaintiff's claim that the defendants unconstitutionally burdened his religious exercise by making him drink water during Ramadan was mooted where the defendants issued a directive providing express protection for inmates fasting during Ramadan); *Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 377 (2d Cir. 2004) (finding that amendment of allegedly unconstitutional ordinance rendered action moot where record provided no basis to believe municipality intended to ever change ordinance back to its objectionable form); *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451-52 (2d Cir. 2002) (per curiam) (finding that where challenged regulation is revised, and plaintiff does not challenge the constitutionality of the revised regulation, "there is no reason to think . . . the town has any intention of returning to the prior regulatory regime" or "that any unconstitutional restrictions are currently in place."); *Tawwab v. Metz,* 554 F.2d 22, 24 (2d Cir. 1977) (finding that it was absolutely clear that challenged prison policy would not recur where policy change was embodied in an official prison document); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 109 F. Supp. 3d 626, 630 (S.D.N.Y. 2015) (finding that plaintiff's claims were mooted by the defendant's adoption of a new policy), *aff'd*, 815 F.3d 105 (2d Cir. 2016); *Pilgrim v. N.Y.S. Dep't of Corr. Servs.*, No. 9:07-CV-1001 GLS/RFT, 2011 WL 6031929, at *3 (N.D.N.Y. Sept. 1, 2011) ("Defendants have met their heavy burden of demonstrating that DOCS's practice of

allowing only members of certain religious sects, such as those of the Rastafarian faith, to maintain dreadlock hairstyles, and punishing noncompliance with their Directive, has ceased, and there is no reasonable probability that such a practice will recur. The voluntary change occurred in the form of a new, superceding Directive, and as 'this change in policy is embodied in an official prison document it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (quoting *Tawwab*, 554 F.3d at 24 (internal alterations omitted))); *Byrd v. Goord*, No. 00 CV 2135 (GBD), 2007 WL 2789505, at *3 (S.D.N.Y. Sept. 26, 2007) ("The possibility that DOCS would be free to reinstate its commission practice, upon expiration of the contract or after a new governor assumes office, was intentionally foreclosed by the New York State legislature's enactment of Correction Law § 623. Under these circumstances there is no basis from which it can reasonably be inferred that DOCS might reinstate its commission practice." (collecting cases)); *Bosco v. Apker*, 445 F. Supp. 2d 398, 400 (S.D.N.Y. 2006) ("In light of the BOP's policy change, Bosco's petition is moot.").

Because the Transition Policy was issued in order to comply with the new requirements of 42 C.F.R. § 438.62, the facts here are distinguishable from the cases relied upon by the Plaintiffs, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, -- U.S. --, 137 S. Ct. 2012, 198 L. Ed. 2d 551 (2017), and *Hilton v. Wright,* 235 F.R.D. 40 (N.D.N.Y.2006). In those two cases, the defendants issued public announcements or policies, which did not carry the force of law, and could therefore be changed by subsequent leadership. Here, there has been a change in the law which binds future administrations.

Finally, the Court is satisfied that the Defendant's actions have "completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *Granite State Outdoor Advert.*, 303 F.3d at 451). That

is, Guadagna has been restored to his previous levels of care. If his new MLTCP assesses that he requires less care, it will have to provide him with notice of his right to fair hearing with aid continuing, pursuant to federal and state law. As stated above, Samele and Roher never had their levels of care reduced or terminated.

Therefore, the Court finds that the named Plaintiffs' claims are moot.

## 2. Inherently Transitory

However, even if the named Plaintiffs' claims are moot, the putative class' claims may still survive if the Court finds that the nature of the claims are inherently transitory.

The inherently transitory exception applies to putative class actions if "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016).

Where class claims are inherently transitory, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Gerstein*, 420 U.S. at 110 n.11, 95 S. Ct. at 861 n.11; *Sosna*, 419 U.S. at 401–02, 95 S. Ct. at 558.

Even where the class is not certified until after the claims of the individual class representatives have become moot, certification may be deemed to relate back to the filing of the complaint in order to avoid mooting the entire controversy. *See, e.g., McLaughlin*, 500 U.S. at 52, 111 S. Ct. at 1667 ("That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction."); *Geraghty*, 445 U.S. at 404, 100 S. Ct. at 1212–13 ("[A]n action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied. The proposed representative retains a "personal stake" in obtaining class certification sufficient to

assure that Art. III values are not undermined. If the appeal results in reversal of the class certification denial, and a class subsequently is properly certified, the merits of the class claim then may be adjudicated pursuant to the holding in *Sosna*" (internal footnote omitted)); *Sosna*, 419 U.S. at 402 n.11, 95 S. Ct. at 559 n.11 ("There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review."); *Amador v. Andrews*, 655 F.3d 89, 101 (2d Cir. 2011) ("It would seem to us that the principle espoused in *Geraghty* is applicable whether the particular claim of the proposed class plaintiff is resolved while a class certification motion is pending in the district court (as in the present case) or while an appeal from denial of a class certification motion is pending in the court of appeals (as in *Geraghty*). In neither event is the plaintiff automatically disqualified from being a class representative." (quoting *Wilkerson v. Bowen,* 828 F.2d 117, 121 (3d Cir. 1987))); *Comer*, 37 F.3d at 799 ("Where the claims of the named plaintiffs become moot prior to class certification, there are several ways in which mootness is not had. . . . [U]nder the appropriate circumstances, class certification may relate back to the filing of the complaint. Normally, the Court has held circumstances appropriate where the claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires. In such cases, the courts permit the class certification to relate back to the filing of the complaint and hold that the plaintiffs have properly preserved the merits of the case for judicial resolution." (internal citations and quotation marks omitted)); *Alexander v. Cochran*, No. 3:11-CV-1703 (MPS), 2017

WL 522944, at *5 (D. Conn. Feb. 8, 2017) ("A putative class action does not necessarily become moot when the named plaintiff's personal stake expires, even though the class has not yet been certified or class certification has been denied. For example, the exception to the mootness doctrine for inherently transitory claims asserted by the named plaintiff(s) in a class action allows such claims to relate back to the time of the filing of the complaint with class allegations." (internal citations and quotation marks omitted)); *Jobie O.*, 2007 WL 4302921, at *7 ("[I]n the context of a putative class action involving transitory claims, even if the named plaintiff's claim has become moot, a decision on class certification can relate back to the filing of the complaint and he may continue to represent the class. . . . [T]his "relation back" doctrine ordinarily applies where the named plaintiff's claims become moot *after* the named plaintiff moves for class certification but *before* the class is certified . . . ." (internal citation omitted)).

"Whether claims are inherently transitory is an inquiry that must be made with reference to the claims of the class as a whole as opposed to any one individual claim for relief." *Amador*, 655 F.3d at 100 (internal citations omitted).

Here, Guadagna's claims were mooted after the Plaintiffs moved for class certification. The Defendant could continually pick off named plaintiffs in this case who had their services reduced by restoring their care to previous levels on a case by case basis. Without ensuring that all individuals who had their services reduced were restored to their previous levels of care, claims such as Guadagna's are inherently transitory, and capable of repetition while evading review. "In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *McLaughlin*, 500 U.S. at 52, 1111 S. Ct. at 1667.

Second, there will be a constant class of persons suffering the deprivation complained of by Guadagna. Four thousand Medicaid recipients received home care services through GuildNet

in Westchester, Suffolk, and Nassau counties as of March 1, 2017. Although the Plaintiffs have not provided evidence as to how many individuals switched to another MLTCP and were provided with less care, the Court is "confident that there is a constant class of persons suffering the deprivation alleged in the complaint," *Salazar*, 822 F.3d at 74, due to the large number of former GuildNet enrollees.

Therefore, the Court finds that claims such as Guadagna's are inherently transitory, and his claims brought on behalf of the putative class survive because the motion for class certification could relate back to the date of the filing of the complaint. *Alexander*, 2017 WL 522944, at *5 (finding that the named plaintiffs' claims were preserved for the purposes of the putative class action because the claims were inherently transitory); *Abdi v. Duke*, 280 F. Supp. 3d 373 (W.D.N.Y. 2017) ("Moreover, even if the individual claims were mooted, the putative class claims would survive under the inherently transitory exception to the mootness doctrine."), *order clarified sub nom. Abdi v. Nielsen*, 287 F. Supp. 3d 327 (W.D.N.Y. 2018); *Monaco v. Stone*, 187 F.R.D. 50, 60 (E.D.N.Y. 1999) ("[P]laintiff Gregory Monaco may still act as the named representative for the proposed plaintiff class despite the loss of his individual claims. A named plaintiff may still litigate a class action despite the loss of their personal stake if the claims are capable of repetition, yet evading review." (internal citations and quotation marks omitted)).

Accordingly, Guadagna's claims brought on behalf of the putative class survive, and the Defendant's motion to dismiss his claims brought on behalf of the putative class is denied.

**B. As to the Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6)**

**1. The Legal Standard**

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Bold Elec., Inc. v. City of N.Y.*, 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009)).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679.

### 2. Application to the Plaintiff's Claims

The Defendant does not address the Plaintiffs' substantive claims. Instead, the Defendant argues that the Plaintiffs' requests for injunctive relief must be dismissed. First, the Court notes that injunctive relief is a remedy, and not a cause of action. *KM Enterprises, Inc. v. McDonald*, No. 11-CV-5098 (ADS) (ETB), 2012 WL 4472010, at *20 (E.D.N.Y. Sept. 25, 2012) (Spatt, J.) ("[A] request for injunctive relief is not a separate cause of action." (internal citations and quotation marks omitted), *aff'd*, 518 F. App'x 12 (2d Cir. 2013); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) ("Declaratory judgments and injunctions are remedies, not causes of action." (internal citations omitted)). Second, the cases cited by the Defendant in support of its motion to dismiss dealt with motions for injunctive relief, not motions to dismiss. The Plaintiffs have not yet moved for a preliminary or permanent injunction. The Court has already found that Guadagna has standing to bring claims on behalf of the putative class.

As the Defendant has not addressed the Plaintiffs' substantive claims, the Court will not engage in an analysis of the Plaintiffs' Medicare, ADA, or Due Process claims. In any event, as to the Defendant's assertion that the Plaintiffs will not be able to show irreparable harm or likelihood of success, the Court disagrees. Guadagna and those similarly situated received less care after switching MLTCPs, and they were not given notice of their right to a fair hearing with aid continuing. Loss of medical care constitutes irreparable harm. *Strouchler*, 891 F. Supp. 2d at 520 ("[T]he mere threat of a loss of medical care, even if never realized, constitutes irreparable harm."). Furthermore, the Defendant is incorrect that the Plaintiffs cannot show a likelihood of success on the merits because the DOH implemented the Transition Policy. The Transition Policy did not affect Guadagna or those similarly situated. Indeed, Guadagna continued to receive less care after the Transition Policy was put into place. As the Court has already found,

claims such as Guadagna's are inherently transitory because DOH has not implemented a policy to ameliorate the harm experienced by those similar to Guadagna.

Therefore, as the Court has already determined that the Defendant's actions have not mooted Guadagna's claims brought on behalf of the putative class, the Defendant's motion to dismiss those claims pursuant to Rule 12(b)(6) is denied.

## C. As to the Plaintiffs' Motion for Class Certification

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S. Ct. 2140, 2153, 40 L. Ed. 2d 732 (1974) (internal citations and quotation marks omitted). Thus, when deciding a motion to certify a class, the allegations in the complaint are accepted as true. *See Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n.15 (2d Cir. 1978).

"Rule 23 requires a litigant who would bring a class action to overcome two hurdles. First, he must satisfy all the conditions of 23(a) and then he must also convince the court that his action is appropriate under one of the three subdivisions of 23(b)." *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir. 1968); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S. Ct. 2231, 2245, 138 L. Ed. 2d 689 (1997).

### 1. Rule 23(a) Prerequisites

The Rule 23(a) prerequisites to a class action are: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). These requirements are generally referred to as numerosity,

commonality, typicality, and adequacy of representation. *See General Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S. Ct. 1698, 1706, 64 L. Ed. 2d 319 (1980).

The Plaintiffs seek certification of a class of the 4,000 Medicaid recipients who received home care services through GuildNet in Westchester, Suffolk, and Nassau counties as of March 1, 2017.

However, the Court has already found that only those individuals who transferred from GuildNet to another MLTCP and received less care have standing. Therefore, the Plaintiffs' proposed class includes individuals who do not have standing, and it is overly broad. "[N]o class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (collecting cases); *see also Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017) ("Put differently, 'Article III's jurisdictional requirements [apply] to each member of a class.'" (quoting *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 126 (2d Cir. 2007))). Ultimately, the question of standing must "be examined through the prism of the class definition and, in this Circuit, a class cannot be certified if any person captured within that definition lacks Article III standing." *Calvo*, 2017 WL 4231431, at *3 (citing *Denney*, 443 F.3d at 263–64). Therefore, the Plaintiffs' proposed class cannot be certified under its current definition.

While the Court in its discretion could certify a more narrow class, such as one that includes those individuals who switched plans and received a lower standard of care without notice of a right to a fair hearing with aid continuing, the Plaintiffs stated in their memorandum in opposition to the Defendants' motion to dismiss that they had not yet received any information regarding those individuals. (*See* Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss at 18 ("DOH has provided no evidence whatsoever about the status of the care of putative class members who

switched from GuildNet to a new MLTCP as Mr. Guadagna did.")). Therefore, at this juncture, the Court does not have any information as to how many individuals switched from GuildNet to a new MLTCP and received less care without notice.

While the Plaintiffs need not provide an exact number of individuals to meet the numerosity requirement, they must at least present some evidence of, or reasonably estimate, the number of class members. *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir. 1993). As their motion dealt solely with a class of individuals who had been previously been served by GuildNet, they did not provide any evidence as to the number of individuals who received less care upon switching to a new MLTCP. Although the Second Circuit has held that a prospective class of forty or more raises the presumption of numerosity, *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995), the Plaintiffs have not submitted any evidence or estimated that the prospective class exceeds forty individuals.

Accordingly, the Plaintiffs' motion for class certification pursuant to Rule 23 is denied without prejudice with leave to renew. In light of the Court's decision, the Plaintiffs should address the size of any class encompassing persons who switched from GuildNet to a new MLTCP, and received less care without notice of a right to fair hearing with aid continuing.

## III. CONCLUSION

For the reasons stated above, the Defendant's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) is granted in part, and denied in part. It is granted to the extent that Samele and Roher's claims are dismissed because they do not have standing. It is denied to the extent that the inherently transitory exception applies to claims such as Guadagna's, and his claims are preserved for the purposes of the putative class action.

In addition, the Plaintiffs' motion for class certification pursuant to Rule 23 is denied without prejudice with leave to renew.

The Clerk of the Court is respectfully directed to terminate Samele and Roher from the action. The caption is accordingly amended as follows:

---------------------------------------------------------X

SALVATORE GUADAGNA,
*on behalf of all persons similarly situated*,

                        Plaintiff(s),

           -against-

HOWARD ZUCKER, *as Commissioner*
*of the New York State Department of Health*,

                      Defendant.
---------------------------------------------------------X

It is **SO ORDERED:**

Dated: Central Islip, New York

      August 2, 2018

                              ___*/s/ Arthur D. Spatt*___

                               ARTHUR D. SPATT

                       United States District Judge