**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
SALVATORE GUADAGNA, individually and on
behalf of all persons similarly situated,

        Plaintiff,

    -against-

HOWARD ZUCKER, as Commissioner of the New
York State Department of Health,

        Defendant.
------------------------------------------------------------X

                **REPORT AND**
                <u>**RECOMMENDATION**</u>

              CV 17-3397 (SJF) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.**   <u>P</u>RELIMINARY <u>S</u>TATEMENT

   Plaintiff Salvatore Guadagna ("Guadagna"), on behalf of himself and the putative class,

commenced this action against Defendant Howard Zucker (the "Commissioner" or

"Defendant"), as Commissioner of the New York State Department of Health (the "DOH"),

alleging violations of the Medicaid Act, 42 U.S.C. § 1396 *et seq*., the Americans with

Disabilities Act (the "ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act,

29 U.S.C. § 794, and Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

*See generally* Amended Complaint ("Am. Compl.") [DE 38].  The class (collectively with

Guadagna, "Plaintiffs") consists of Medicaid recipients who were enrolled in GuildNet, Inc.

("GuildNet") -- managed long-term care plans in Suffolk, Nassau, or Westchester Counties -- as

of March 1, 2017 and who suffered reductions in care without prior notice and an opportunity to

be heard when they were transferred to new managed long term care plans prior to October 2,

2017 as a result of GuildNet's closure in their counties of residence.  *See* DE 41.

The parties have filed cross-motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Plaintiffs' Notice of Motion for Partial Summary Judgment (Pls.' Not. of Mot.") [DE 120]; Defendant's Notice of Cross-Motion for Summary Judgment (Def.'s Not. of Mot.") [DE 133]. Plaintiffs move for summary judgment on their claims brought under the Medicaid Act and the Due Process Clause of the Fourteenth Amendment. *See* Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Pls.' Mem.") [DE 120-1]; Plaintiffs' Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgment [DE 139] ("Pls.' Opp'n"); Plaintiffs' memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Reply") [DE 139]. The Commissioner cross- moves for summary judgment on these same claims, as well as on Plaintiffs' claims under the ADA. The Commissioner also seeks permanent injunctive relief. *See* Defendant's Memorandum of Law in Support of Cross-Motion for Summary Judgment ("Def.'s Mem.") [DE 134]; Defendant's Reply Memorandum of Law in Support of Cross-Motion for Summary Judgment [DE 144] ("Def.'s Reply"). The cross-motions have been referred by Judge Feuerstein to this Court for a Report and Recommendation as to whether the motions should be granted. *See* DE 167.

For the reasons which follow, the Court respectfully recommends to Judge Feuerstein that Plaintiffs' motion for summary judgment be GRANTED, in part, and DENIED, in part, and that Defendant's motion for summary judgment be GRANTED, in part, and DENIED, in part.

## II.    BACKGROUND

### A.    Procedural History

On June 6, 2017, Plaintiffs Gemma Samele, Marie Turano and Leonard Turano (the "Original Plaintiffs") commenced this action against the Commissioner.  *See* Complaint ("Compl.") [DE 1].  On August 3, 2017, the Commissioner filed an Answer to the Complaint.  *See* Answer [DE 12].  The Original Plaintiffs filed an Amended Complaint on November 20, 2017, and that remains the operative pleading in this action.  *See* Am. Compl. [DE 28].  The Amended Complaint added Salvatore Guadagna and Selma Roher as Plaintiffs, but alleged the same violations and sought the same types of relief as the original Complaint.  *Compare* Am. Compl., *with* Compl.  Specifically, the Amended Complaint asserts three causes of action.  The first cause of action asserts the Commissioner's alleged "failure to ensure that Plaintiffs will have their long-term care benefits continued at their current level until and unless they receive [notice and a fair hearing] to challenge any proposed reduction or termination [of their benefits] violates [the Medicaid Act and the Due Process Clause of the Fourteenth Amendment]."  Am. Compl. ¶ 235.  The second cause of action contends that the Commissioner's alleged "failure to ensure that Plaintiffs will not have their long-term care benefits reduced or terminated based on … non-individualized criteria when GuildNet terminates … its services in their counties or residence violates Plaintiffs' substantive due process rights under the Due Process Clause of the Fourteenth Amendment."  *Id*. ¶ 236.  The third cause of action states that the Commissioner's alleged "failure to ensure that Plaintiffs maintain their long-term care benefits during the involuntary transfer to a new MLTCP … threatens to result in unnecessary institutionalization of class members, in violation of [the ADA and the Rehabilitation Act]."  *Id*. ¶ 237.  The Amended Complaint seeks, among other things, declaratory and permanent injunctive relief.

3

On August 8, 2019, Hon. Arthur D. Spatt, the District Judge who was then assigned to this case, granted Plaintiffs' class certification motion pursuant to Rule 23(b)(2) and appointed Salvatore Guadagna as class representative.  *See* DE 125.  On November 15, 2019, the class definition was revised, pursuant to an agreement between the parties, as follows:

> All Medicaid recipients who were enrolled in the GuildNet managed long-term care plans in Suffvolk, Nassau, or Westchester County as of March 1, 2017 and who suffered reductions in care without prior notice and opportunity to be heard when they transferred to new managed long-term care plans prior to October 2, 2017 as a result of GuildNet's closure in their counties of residence.

DE 141 at 2.

On November 21, 2017, Marie Turano and Leonard Turano voluntarily dismissed their claims against the Commissioner by stipulation.  *See* DE 31.  On December 21, 2017, the Commissioner filed a motion to dismiss for lack of jurisdiction, pursuant to Rules 12(b)(1) and 12(b)(6).  *See* DE 39.  On August 2, 2018, Judge Spatt granted the Commissioner's motion to dismiss with regard to Samele and Roher, but denied the motion with regard to Guadagna, who is now the only remaining named Plaintiff.  *See* August 2, 2018 Memorandum of Decision & Order ("Mem. & Order") [DE 71].

On July 9, 2019, Plaintiffs moved for summary judgment on their claims brought under the Medicaid Act and the Due Process Clause of the Fourteenth Amendment.  *See* Pls.' Mem.; Pls.' Opp'n.  The Commissioner opposes the motion and cross-moves for summary judgment on Plaintiffs' claims under the Medicaid Act and Due Process Clause, as well as Plaintiffs' claims under the ADA and for permanent injunctive relief.  *See* Def.'s Mem.; Def.'s Reply.  The cross-

motions have also been referred to this Court by Judge Feuerstein for a Report and Recommendation as to whether the motions should be granted.[1]  *See* DE 167.

**B.    The Undisputed Material Facts**

The following facts are drawn from the parties' Rule 56.1(a) Statements of Material Facts, Rule 56.1(b) Counterstatements of Material Facts, the declaration and affidavits submitted in support of and in opposition to each party's motion and the exhibits attached to those affidavits, and the memoranda of law and reply memoranda filed in support of and in opposition to each party's motion.  The facts cited here are undisputed unless otherwise noted.  In considering each motion for summary judgment, the Court construes the facts in the light most favorable to the party opposing the respective motion.  *See Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### *1.    State of New York's Managed Long Term Care Plans*

The New York State Department of Health ("DOH") requires individuals residing in Nassau, Suffolk, Westchester counties and New York City who are eligible for both Medicaid and Medicare, are over 21 years of age, and will need community based long term care services for at least 120 days to obtain such care through enrollment in a managed long term care plan ("MLTCP").  *See* Defendant's Counterstatement of Facts in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s COMF") [DE 120-4] , annexed as Ex. T to the Declaration of Jane G. Stevens, Esq. in Support of Plaintiffs' Motion for Summary Judgment ("Stevens Decl.") [DE 120-3] , Bates # 346-392,  ¶ 1; Plaintiff's Counterstatement of Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s COMF") [DE 106-2] ¶ 5.  Those required

---

[1]        Following the untimely death of Judge Spatt, this case was reassigned to Judge Feuerstein on June 30, 2020.  *See* June 30, 2020 Electronic Order.

to enroll in an MLTCP must choose from the plans operating in their county or be auto-assigned. Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment[2] ("Pls.' SOMF") [DE 120-4] ¶ 2.  Maximus is New York State's contracted enrollment broker.  *Id*. ¶ 3. MLTCPs assess potential enrollees to determine which managed long term care ("MLTC") services the MLTCP believes the enrollee requires and in what amounts.  *Id*. ¶ 4.  Potential enrollees may seek assessments from multiple MLTCPs and choose a plan of care in which to enroll.  *Id*. ¶ 5.  Individuals who are involuntarily disenrolled from one MLTCP who have not lost their underlying eligibility for MLTCP services are automatically enrolled in another MLTCP and guaranteed continuity of care for at least 60 days.  *Id*. ¶ 6.

By definition, all putative class members were enrolled in an MLTCP administered by GuildNet in Nassau, Suffolk, and Westchester Counties as of March 2017.  *Id*. ¶ 7.  In March 2017, there were 4174 individuals enrolled in the GuildNet MLTCP in Nassau, Suffolk and Westchester Counties.  *Id*. ¶ 10.  The contract between DOH and MLTCPs serving the relevant counties, including GuildNet, calls for each MLTCP to assess the appropriate long term care services required for each of its enrollees at the time of enrollment and at least every six months thereafter.  *See* MLTCP Model Contract, annexed as Ex. A to the Stevens Decl. [DE 120-3] at 22, 39.

---

[2]        In connection with their motion for summary judgment, Plaintiffs did not submit a Statement of Material Facts in accordance with Local Rule 56.1.  Rather, Plaintiffs submitted the "Defendant's Counterstatement to Plaintiffs' Rule 56.1 Statement."  *See* DE 120-4.  Defendants' Rule 56.1 Counterstatement sets forth the Plaintiff's Rule 56.1 Statement in separately numbered paragraphs which are each immediately followed by a separate paragraph setting forth Defendant's "counterstatement."  *See* DE 120-4.  The Court hereafter refers to Plaintiff's Rule 56.1 Statement as "Pls.' SOMF" and to Defendant's "counterstatement" as "Def.'s COMF."

## 2.    *Facts Applicable to Class as a Whole*

On November 15, 2016, GuildNet informed the DOH by letter that it intended to cease enrollment of new members into GuildNet's long term care plans in Nassau, Suffolk and Westchester Counties, and sought assistance from the DOH to vacate from these counties. Defendant's Statement of Material Facts in Support of Motion for Summary Judgment ("Def.'s SOMF") [DE 133-2] ¶ 18.  On February 16, 2017, GuildNet notified the DOH that it intended to discontinue long term care services in Nassau, Suffolk and Westchester Counties.  *Id.* ¶ 19; Pls.' SOMF ¶ 12.  Shortly thereafter, GuildNet sent a letter to the DOH on February 24, 2017 which set forth what it understood to be its responsibility for withdrawal from the relevant counties (the "February 2017 Letter").  Def.'s SOMF ¶ 20.  GuildNet informed the DOH that, "given the high hours and extensive CDPAS [Consumer Directed Personal Assistance Services] enrollment, we are seeking to have Maximus [New York State's contracted Medicaid enrollment broker] immediately work with us to begin a plan to plan voluntary-mandatory enrollment and/or auto assignment."  *Id*.  GuildNet requested a 90 day transition period at the end of which GuildNet would cease providing long term care services.  Pls.' SOMF ¶ 23.

In response, on March 7, 2017, the DOH wrote to GuildNet that "the same protocols as a plan to plan transfer are to be followed for all members, whereby the selected receiving plan must complete a uniform assessment (UAS) and a proposed plan of care must be accepted by the member before a transfer can be effectuated.… While we expect Maximus to be engaged in assisting members with education and guidance in choosing a new plan, there will be <u>no</u> mandatory enrollment.  We explicitly note that there will be <u>no</u> auto-assignment."  Def.'s SOMF ¶ 22 (emphasis in original); Pls.' SOMF ¶ 16 (emphasis in original).  The DOH also denied

7

GuildNet's transition period request stating that "[t]here will be no 90 Day expiration on GuildNet's responsibility to membership after the initial notification."  Pls.' SOMF ¶ 24.

Approximately two weeks later, GuildNet sent a letter to all of its affected enrollees on March 20, 2017, advising them that GuildNet would no longer be offering them managed long term care ("MLTC") services effective June 1, 2017 (the "March 2017 Letter").  Pls.' SOMF ¶ 18.  GuildNet's March 2017 Letter stated, in relevant part:

> **GuildNet will no longer offer Managed Long Term Care (MLTC) services in Nassau County effective June 1, 2017.**
>
> **It is important that you select a new MLTC plan before May 18, 2017 to assure a smooth transfer to your new plan.** You will continue to receive services from Guild Net until your transfer to your new plan is complete.

Letter from GuildNet to Enrollees dated March 20, 2017, annexed as Ex. F to the Declaration of Dorothy O. Nese, Esq. in Support of Defendant's Motion for Summary Judgment ("Nese Decl.") [DE 133-6] at 44 (emphasis in original).

The DOH reviewed and approved the March 2017 Letter.  However, it did not give GuildNet permission to stop providing long term care services effective June 1, 2017.  Pls.' SOMF ¶¶ 21-22.  On March 24, 2017, the DOH notified other MLTCPs operating in Nassau, Suffolk, and Westchester Counties by email that, effective immediately, GuildNet would no longer be accepting new enrollees in those counties. Def.'s SOMF ¶ 25.  The DOH further advised that GuildNet would remain responsible for its enrollees in those counties "until such time as the member's MLTCP of choice completes assessment and a smooth transition has been completed."  *Id*.; Pls.' SOMF ¶ 26.

On March 28, 2017, a representative from an MLTCP asked the DOH about the responsibilities of the MLTCPs accepting transferring GuildNet enrollees.  Pls.' SOMF ¶ 27. The representative asked:  "Will the new MLTC be responsible for maintaining the same care

plan for the first 90 days of enrollment?  We have had several GuildNet members who have reached out for enrollment." *Id*.  In response, the DOH stated that its policy did not require MLTCPs to provide continuity of care to enrollees transferring from GuildNet. *Id*. ¶ 28.  The DOH stated, in relevant part, that:

> [t]he answer to this question is no, you do not need nor are you required to provide continuity of care to any GuildNet members for 90 days, as this is considered a plan to plan transfer. This is not making some people happy but it is the policy and it will be expected to be followed.

*Id*.

It is undisputed that between March 2017 and September 2017, the DOH did not require other MLTCPs operating in the three relevant counties to offer transferring GuildNet enrollees the same long term care services that they had been receiving from GuildNet. *Id*. ¶ 29.  Also during this time, the DOH did not require any entity to send timely and adequate notices of any reduction of long term care services to GuildNet enrollees if their services were reduced upon transferring to a new MLTCP. *Id*. ¶ 30.

In response to GuildNet's March 2017 Letter, the DOH began receiving complaints and inquiries from GuildNet enrollees and their family members. Pls.' SOMF ¶¶ 32, 52-56; Def.'s SOMF ¶ 26.  GuildNet enrollees and their families reported that they felt GuildNet was pressuring them to leave its plan before June 1, 2017 and that GuildNet's action were curtailing the enrollees' ability to freely choose a new plan of care offered by another MLTCP.  Pls.' SOMF ¶ 32.  They also complained about difficulties they experienced in obtaining the same long-term care services from other MLTCPs that they had been receiving from GuildNet. *Id*. ¶¶ 32, 52.  Consequently, on May 13, 2017, the DOH sent a letter to GuildNet enrollees clarifying GuildNet's March 2017 Letter (the "May 2017 Letter"). *Id*. ¶ 34.  The DOH's May 2017 Letter stated the following:

> You were recently sent a letter from GuildNet, your Managed Long Term Care Plan, informing you of their intent to no longer serve your county effective June 1, 2017. The letter suggests that you should select a new Managed Long Term Care Plan before May 18, 201 7 to ensure a smooth transfer to a new plan by June 1, 2017. We are concerned that this letter is causing confusion, and want to clarify that **you do not need to transfer to a new plan by June 1, 2017.**
>
> GuildNet has requested to stop providing services in your county. During this transition, the State requires GuildNet to continue providing your existing services until a smooth transfer can be completed to your new plan of choice. You can contact *New York Medicaid Choice* (NYMC) for information about plans available to you and assistance with enrolling in a new plan. All plans provide the same core services and benefits….
>
> There is no firm deadline for switching to a new plan. You may remain in GuildNet and continue to receive your existing level of services until you have found a plan that meets your needs and the enrollment transfer can be arranged….
>
> If you experience any disruption to your services before or after June 1, 2017, please contact either New York State Department of Health (NYSDOH) or the Independent Consumer Assistance Network (ICAN) immediately.

Letter from the DOH to Enrollees dated May 13, 2017, annexed as Ex. F to the Nese Decl. at 6-7 (emphasis in original).

Sometime in May 2017, the DOH informed the MLTCPs operating in Nassau, Suffolk and Westchester Counties that it was re-evaluating a 90 day continuity of care policy that would allow members transferring out of a closing plan to receive the same level of long term care services as were previously authorized by their former plan. Pls.' SOMF ¶ 38; Def.'s SOMF ¶ 35. On July 14, 2017, the DOH informed the MLTCPs operating in the relevant counties that a 90 day transitional care requirement for affected GuildNet enrollees had not been issued as of that date. *Id.* ¶ 38; Def.'s SOMF ¶ 36. Sometime in September 2017, the DOH sent a letter to GuildNet enrollees informing them for the first time that it was working on a transition policy which would allow them to transfer to a new plan of care while maintaining their current level of

long term care services.  Pls.' SOMF ¶ 41.  Prior to this point, GuildNet enrollees were not advised that any transition policy was intended to be implemented.  *Id*. ¶ 45.

The DOH sent a letter to all MLTCPs in Nassau, Suffolk and Westchester Counties On September 21, 2017, advising them that it had developed a "Continuity of Care Policy" which would govern the transfers of enrollees from closing plans (the "September 21, 2017 Letter"). Pls.' SOMF ¶ 42; Def.'s SOMF ¶ 37.  This letter described the transfer of GuildNet enrollees in those counties as "an involuntary transition from one MLTC plan to another."  *Id*. ¶ 43; Def.'s SOMF ¶ 37.  Because the transition was designated as "involuntary," the DOH advised that it would provide notice to GuildNet enrollees instructing them to contact "[New York Medicaid Choice ("NYMC")], the State's Enrollment Broker, if they feel that their new MLTC plan provides fewer hours of care or fewer services than was received while a GuildNet member." Letter from the DOH to MLTPs dated September 21, 2017, annexed as Ex. F to the Nese Decl. at 18.  The DOH further explained that:

> On behalf of the Department, NYMC will be verifying the member's enrollment in GuildNet during March 2017, and will be requesting information on the member's plan of care from GuildNet with respect to the time of disenrollment; and the receiving plan with respect to the currently approved plan of care. The Department will review this information, and if warranted, direct the receiving plan to reinstate services for at least 120 days, to the level at the time of disenrollment from GuildNet.
>
> [NYMC] will be distributing letters dated 9/29/2017 to impacted members, instructing them to contact NYMC by 12/29/2017 if they wish to request reinstatement of their previous level of service. All MLTC plans must be prepared to provide NYMC with the requested plan of care information within one week of request. The Department will review the information and establish a reasonable time frame for the plan to respond to the request for reinstatement of the previous level of service.
>
> The Department has developed a Continuity of Care Policy which, going forward, will address transfer to new plans with the withdrawal or termination of any plan, and direct the receiving plan to provide 120 days continuity of care.

11

*Id.*

One day later, on September 22, 2017, the DOH issued "Managed Long Term Care Policy 17.02: MLTC Plan Transition Process-MLTC Market Alteration" which revised the DOH's transition policy and created an involuntary transfer procedure (the "Transition Policy"). Pl.'s SOMF ¶ 44; Def.'s SOMF ¶ 38.  Effective as of October 2, 2017, the Transition Policy established the following requirements in the event of a plan closure:

> 1. ***Requests***. Requests to withdraw from the market through plan closure must be formally submitted to the Department, and receive specific approval, prior to any action on the part of the plan. A formal request must include a proposed date for implementation, and a detailed transition/termination plan that includes timelines. Alternatively, an MLTC plan may submit a notice of intent, and the Department will work with the interested party(s) to identify milestones and deliverables for a transition plan to accomplish the expressed outcome. The Department must approve any request to withdraw.

> 2. ***Notices***. A draft of all proposed enrollee notifications must be included with any request to withdraw from the market through plan closure. Notices shall include a listing of available plans and direction to select a new plan within sixty (60) days of the date of the letter, and shall clearly state that enrollees who do not select a plan within sixty (60) days, will be auto– assigned to a new MLTC plan. Members will be provided with information on all available product types, but any necessary auto–assignment will be to a Partially Capitated MLTC Plan. The Department will take steps to preserve enrollee – provider relationships with any necessary auto assignment. Notices will be issued by the State´s Enrollment Broker, New York Medicaid Choice (NYMC) and enrollees will be provided with written information on plan choice and will be directed to NYMC for education on available options. MLTC plan network overlap analysis will be conducted, and NYMC will provide transferring enrollees with information on provider network relationships. The Department will determine the need to stagger mailings to impacted membership based on the number of enrollees that need to be transferred.

> 3. ***Transition of Enrollees***. Enrollees may not be transitioned until the request for plan closure and all member notifications have been approved by the Department. In all cases of market withdrawal, enrollees will be directed to contact NYMC, and NYMC will process the transfer to the new plan of choice via a ´warm transfer´ process, meaning that both the transferring plan and the receiving plan are simultaneously communicating with NYMC. NYMC will subsequently process the enrollment transaction to the receiving plan. The plan that is closing must provide the new plan of choice with detailed information on the enrollee´s

plan of care and network provider relationships within five (5) business days of
notification of the selection.

The new plan must accept the transfer enrollment of all enrollees that select or
are auto–assigned to the plan. These transferring enrollees are presumed to meet
the eligibility requirements for MLTC and are not required to be assessed prior
to enrollment.

The new plan must continue to provide services under the enrollee´s existing plan
of care, and utilize existing providers, for the earlier of the following: (i) one
hundred twenty (120) days after enrollment; or (ii) until the new plan has
conducted an assessment and the enrollee has agreed to the new plan of care. The
new plan is required to conduct an assessment within 30 days of the transfer
enrollment effective date, unless a longer time frame has been expressly
authorized by the Department in its sole discretion.

Managed Long Term Care Policy 17.02: MLTC Plan Transition Process-MLTC Market

Alteration ("Transition Policy"), annexed as Ex. Q to Stevens Decl. at 351.

On September 25, 2017, the DOH sent the first of several "outreach letters" to affected

GuildNet enrollees (the "First Outreach Letter").  Def.'s SOMF ¶ 41.  The First Outreach Letter

advised those still enrolled with GuildNet that the DOH was working on implementing the

Transition Policy and instructed them to remain enrolled in GuildNet until the policy was put in

place if they were concerned about maintaining their current levels of services.  *See* First DOH

Outreach Letter dated September 25, 2017, annexed as Ex. F to the Nese Decl. at 8-9.   Former

GuildNet enrollees who had already transferred to a new MLTCP after March 20, 2017 were

advised that "[i]f your new MLTC plan provides you with fewer hours of care or fewer services

than you had with GuildNet and you think your current level of service is not meeting your

needs, please contact [NYMC] within **90** days from the date of this letter."  *Id*. (emphasis in

original).  A telephone number for NYMC was provided for the former GuildNet enrollees to

contact (the "Maximus Hotline").  *Id*.  The former GuildNet enrollees were further advised that

they "may be eligible to have [their] previous level of care restored if:  [(1)] [they] are in

GuildNet and … left after March 20, 2017; [(2)] [they] are still eligible for the Medicaid program; and [(3)] … were authorized for fewer hours of care and services [in their current MLTCP than they had with GuildNet].” *Id*.

The DOH sent a second outreach letter to those still enrolled in GuildNet on October 16, 2017, (the “Second Outreach Letter”). Def.’s SOMF ¶ 42. The Second Outreach Letter advised the GuildNet enrollees that the Transition Policy had been finalized and that they had 60 days from the date of the letter to select a new MLTCP. *See* Second DOH Outreach Letter dated October 16, 2017, annexed as Ex. F to the Nese Decl. at 14-15. If a new plan was not selected by that time, the GuildNet enrollees were advised that one would be selected for them. *Id*. The GuildNet enrollees were further advised that the new MLTCP would provide the same level of services for 120 days after the transfer date, unless the enrollee and the MLTCP agreed to a different plan before that time. *Id*. The letter also included a list of MLTCPs available in the GuildNet enrollees’ area and advised the enrollees to call NYMC to select a new MLTCP. *Id*.

On November 30, 2017, the DOH sent a third outreach letter to both current and former GuildNet enrollees (the “Third Outreach Letter”). Def.’s SOMF ¶ 43. The Third Outreach Letter restated the instructions provided in the two previous outreach letters and reminded the current and former GuildNet enrollees of the impending deadlines set forth in those letters. *See* Third DOH Outreach Letter, annexed as Ex. F to the Nese Decl. at 16-17.

Between December 18, 2017 and January 19, 2018, the DOH instructed the MLTCPs to provide GuildNet-levels of services to former GuildNet enrollees who called NYMC to complain about their plan of care between September 28, 2017 and January 9, 2018, and for whom the DOH identified the individual as one who received fewer services under their current plan of care than they had with their previous GuildNet plan of care. Def.’s SOMF ¶ 45. Approximately

14

87 former GuildNet enrollees called the Maximus Hotline between September 28, 2017 and January 9, 2018 with complaints about their long term care plans.  *Id.* ¶ 46; Pls.' SOMF ¶ 61. The DOH issued directives to restore care to 64 former GuildNet enrollees between December 18, 2017 and January 19, 2018.  Def.'s SOMF ¶ 47; Pls.' SOMF ¶ 62.  Of those individuals who had initially called the Maximus Hotline with complaints about their long term care services and whose care was not restored, the DOH only received three complaints after "no action" letters were sent to these individuals from the period beginning December 18, 2017 to the present.  *See* Declaration of Erin Kate Calicchia, Deputy Director of the Division of Long Term Care in the Office of Long Term Care Insurance at DOH, in Support of Defendant's Motion for Summary Judgment ("Calicchia Decl.") [DE 132] ¶ 19.  None of these three complaints involved "restoration" of services, or a lack of "restoration" of services.  *Id*.

According to Plaintiffs, a comparison of data[3] which reflects the long term care plans provided by GuildNet  -- and long term care plans initially provided by the new MLTCPs for all GuildNet enrollees who transferred to new MLTCPs between April 1, 2017 and October 1, 2017 -- demonstrates that approximately 900 GuildNet enrollees received less of at least one long term care service in their new plan than they previously had been receiving from GuildNet.  Pls.' SOMF ¶ 51; *see* Declaration of Elizabeth Jois, Esq. in Support of Plaintiffs' Motion for Summary Judgment ("Jois Decl."), annexed as Ex. M. to the Stevens Decl. ¶ 10.  In support of

_____

[3]     During discovery, the Commissioner provided Plaintiffs with two anonymized spreadsheets containing (1) the long term plan of care provided to each GuildNet enrollee who transferred to a new MLTCP between April 1, 2017 and October 1, 2017; and (2) the new long term plan of care for each of these enrollees at their new respective MLTCP.  Pls.' SOMF ¶¶ 46-49; GuildNet POC Spreadsheet, annexed as Ex. N to the Stevens Decl. at 1-156; Other MLTCP POC Spreadsheet, annexed as Ex. O to the Stevens Decl. at 157-292.  The Commissioner also produced a spreadsheet which allows each plan of care in the GuildNet POC Spreadsheet to be matched up to its corresponding plan of care in the Other MLTCP POC Spreadsheet.  *See* POC Key, annexed as Ex. P to the Stevens Decl. at 293-349.

this claim, Plaintiffs submit the declaration of Elizabeth Jois, Esq., a staff attorney in the Special Litigation Unit of the New York Legal Assistance Group, who attests to having "personally reviewed, and supervised the review of the type and level of care provided to each enrollee by GuildNet and the type and level of care provided to each of them after their transfer to new MLTCPs" identified in the data produced by the Commissioner.  Jois Decl. ¶ 8.  Ms. Jois states that the Plaintiffs have identified approximately 900 former GuildNet enrollees who lost care when they transferred to a new plan.  *Id*. ¶ 10.

### 3. *Facts Applicable to Plaintiff Guadagna*

Plaintiff Guadagna, a Medicaid and Medicare recipient, was a former enrollee of GuildNet.  Def.'s SOMF ¶ 49; Pls.' SOMF ¶ 65.  Between 2014 and May 2017, Guadagna received long term care services from GuildNet, including 24 hour live-in home care and Adult Day Health Care ("ADHC").  Def.'s SOMF ¶ 51; Pls.' SOMF ¶¶ 65-66.  When Guadagna received GuildNet's March 2017 Letter, he was attending an ADHC center one day a week, and receiving medical model adult day health services, including physical therapy, occupational therapy, and a bath.  Def.'s SOMF ¶ 51; Pls.' SOMF ¶ 70.  He was also temporarily in a rehabilitation center due to an episode of gout.  Def.'s SOMF ¶ 51; Pls.' SOMF ¶ 71.

After receiving GuildNet's March 2017 Letter, Guadagna's daughter began reaching out to MLTCPs to find one that would offer the same services as GuildNet.  Def.'s SOMF ¶ 52.  Specifically, she called an MLTCP named Northwell which evaluated Guadagna and informed him that that his ADHC services would be terminated if he enrolled with them.  Pls.' SOMF ¶¶ 72-73.  According to Guadagna, he agreed to enroll with Northwell even though his ADHC services would be terminated because, as a result of GuildNet's March 2017 Letter, he was afraid that if he did not transfer to a new MLTCP before May 18, 2017, he would be permanently

placed in an institutional setting. *Id.* ¶ 74. Consequently, on May 1, 2017, Guadagna transferred from GuildNet to Northwell. *Id.* ¶ 75. Around that same time, Guadagna returned home from the rehabilitation center. *Id.* ¶ 76. After returning home, Guadagna could not attend ADHC because Northwell did not approve any ADHC services. *Id*. ¶ 77. Guadagna never received written notice that his ADHC services would be terminated upon his enrollment with Northwell, and he was never told that he could challenge the termination of his ADHC services at a fair hearing. *Id.* ¶¶ 78-79.

On October 11, 2017, Guadagna's daughter called the Maximus Hotline to discuss Northwell's termination of her father's ADHC services and his possible transfer to a new MLTCP named AgeWell. Def.'s SOMF ¶ 54. A Maximus employee placed her on hold and attempted to connect Northwell to the call. *Id*. Because the Maximus employee was unable to get in touch with a Northwell representative, Guadagna's daughter was advised to follow up with Northwell directly the following day. *Id*. After Guadagna's daughter expressed concern about getting through to Northwell, the Maximus employee recommended that they transfer her to AgeWell so that they could inform AgeWell of the transfer and request ADHC services. *Id*. The Maximus employee advised Guadagna's daughter to call Maximus back if AgeWell denied Guadagna ADHC services so that Maximus could file a complaint on Guadagna's behalf. *Id*. Guadagna's daughter responded, "[o]kay, I'll do that." *Id*.

On November 1, 2017, Guadagna transferred to AgeWell. *Id*. ¶ 55. AgeWell provide Guadagna with 24-hour home care but did not agree to provide him with ADHC services. *Id*. The DOH directed AgeWell to restore Guadagna's ADHC services on December 19, 2017. *Id*. That same day, the DOH sent a letter to Guadagna informing him that it had directed AgeWell to restore his services to the level he received from GuildNet and that these services would continue

17

for 120 days after being reinstated, or until a new assessment was completed and the member agreed to a new plan of care. *Id.*

## III.   LEGAL STANDARD

### A.   Rule 56

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); *Fishman by Fishman v. Daines*, 247 F. Supp. 3d 238, 244 (E.D.N.Y. 2017). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005). In dispatching this task, a court need only consider admissible evidence. *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273; *see also McPherson v. N.Y.C.*

18

*Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor.").  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

### B.    Statutory Scheme of the Medicare Act

Medicaid is a program operated jointly by the federal government and the states designed to provide medical assistance to needy persons.  *See* 42 U.S.C. § 1396, *et seq.*  States that participate in Medicaid must comply with federal statutory requirements and accompanying regulations in order to be eligible for federal funding.  42 U.S.C. §§ 1396a, 1396c.  Federal law requires that states administer Medicaid through a single state agency.  *Id.* § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1).

Pursuant to a waiver under Section 1115 of the Social Security Act, New York operates a Medicare managed care program under an approved "Partnership Plan" with the Centers for Medicare and Medicaid Services of the United States Department of Health & Human Services

("CMS"), which allows New York to require most Medicaid beneficiaries to enroll in a managed care organization ("MCO").  MCOs are privately-owned and operated health insurance entities which contract with state Medicaid programs to provide covered services to Medicaid recipients in exchange for payment by the State.  42 U.S.C. § 1396b(m); 42 C.F.R. §§ 438.2, 438.6.  Any Medicaid services provided through an MCO must be provided in accordance with a contract between the State and the MCO.  42 U.S.C. § 1396b(m).

The DOH administers Medicaid in New York and requires medical assistance recipients 21 years of age and over who require community-based long term care services for more than 120 days to enroll in an MLTCP.  Public Health Law ("PHL") § 4403-f(7)(b).  MLTCPs must provide or arrange for health and long-term care services and care management to its enrollees directly or through subcontractors. *Id.* §§ 4403-f(1)–(3).

## IV.  DISCUSSION

### A.    Mootness

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed. 2d 642 (1979).  Special concerns exist with regard to class action mootness.  "[I]n general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994)*.  But if the class is certified before the named plaintiff's claims become moot, he may continue to represent the class, even though his own claims later become moot. *See, e.g.*, *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52, 111 S.Ct. 1661, 114 L.Ed. 2d 49 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11, 95 S.Ct. 854, 861 n.11, 43 L.Ed. 2d 54 (1975).

20

The Commissioner here argues that the Plaintiffs' claims are moot because the Commissioner ensured that the Plaintiffs received continuity of care at the same levels that GuildNet provided them after their transition to a new MLTCP. *See* Def.'s Mem. at 44, 50-52. According to the Commissioner, the Transition Policy ensured continuity of care by guaranteeing that enrollees in an MLTCP withdrawing from the marketplace, such as GuildNet, continued to received identical hours and services from the MLTCP to which they transferred for 120 days. *Id*. Relatedly, the MLTCPs are required to assess potential enrollees before enrolling them into their plan and must reassess enrollees at least every six months. PHL §§ 4403-f(7)(g)(i), 4403-f(7)(g)(iv). The Commissioner maintains that the amounts of care the Plaintiffs currently receive are based on reassessments which have occurred long since the Plaintiffs' transfers from GuildNet and the amounts meet their current needs. *See* Def.'s Mem. at 50-52. As such, the Commissioner argues that the Plaintiffs have already received whatever relief they hope to obtain through this lawsuit. *Id*.

In support of this argument, the Commissioner extensively relies on Judge Spatt's August 2, 2018 Memorandum of Decision & Order (the "August 2, 2018 Order") finding, among other things, that the Original Plaintiffs Samele and Roher's claims were moot. *Id*. In that regard, the Order provided, in relevant part, as follows:

> As an initial matter, the Court finds that the Defendant has, in fact, provided the relief sought by the Plaintiffs. That is, the Defendant's conduct which serves as a basis for this lawsuit has ceased. By mandating that receiving MLTCPs accept enrollees at their previous levels of care, the DOH has ensured that the Plaintiffs and those similarly situated continue to receive their care at the levels previously provided by GuildNet. Furthermore, contrary to the Plaintiffs' contentions, the Transition Policy also ensures that anyone who is forced off of one MLTCP to another due to closure will receive notice of a right to a fair hearing if they are assessed to require less care. Since the enrollees will receive their previous levels of care by the receiving MLTCPs before they are reassessed, any assessment finding that the enrollee requires less care would have to be accompanied by notice of a right to a fair hearing with aid continuing. 42 U.S.C. § 1396a(a)(3)–

21

(4); 42 C.F.R. §§ 431.206(b)-(c), 431.210, 431.211, 438.210(c)-(d), 438.400, 438.404. As the MLTCPs are already bound by statute and regulation to provide notice to enrollees when they take action, the Transition Policy did not need to reiterate it. Therefore, the Commissioner has provided the relief sought by the Plaintiffs.

Second, the Court finds that there is no reasonable expectation that the alleged violation will recur. The DOH issued the Transition Policy in response to CMS' amending of 42 C.F.R. 438.62. Relevant here, the amendment requires states to have "a transition of care policy to ensure continued access to services during a transition from [one Medicaid provider to another] when an enrollee, in the absence of continued services, would suffer serious detriment to their health or be at risk of hospitalization or institutionalization." 42 C.F.R. § 438.62(b). The transition of care must provide, inter alia, that "[t]he enrollee has access to services consistent with the access they previously had, and is permitted to retain their current provider for a period of time ...." *Id.* at § 438.62(b)(1)(i).

While the Plaintiffs are correct that the Defendant's Transition Policy was not issued pursuant to notice and comment, they are incorrect that the DOH could change its policy in the future. This is because the Transition Policy is the state's answer to 42 C.F.R. § 438.62, which was issued pursuant to notice and comment. If the DOH changed its policy in the future, it would not be in compliance with the federal regulation requiring such a transition policy. Therefore, as the Code of Federal Regulations requires that states ensure that enrollees are permitted to receive their previous levels of care when they transition between Medicaid providers, the Court finds that there is no reasonable expectation that the alleged violation will continue.

August 2, 2018 Order at 20-21.

Based on these findings, Judge Spatt dismissed Samele and Roher's claims because they did not leave GuildNet before the implementation of the Transition Policy and thus never had their levels of care reduced or terminated. *Id*. Judge Spatt also found Guadagna's claims moot, because the Commissioner restored Guadagna to his previous levels of care provided by GuildNet. *Id.* at 24. Judge Spatt did not dismiss his claims because Guadagna satisfied the "inherently transitory" exception to the mootness doctrine:

Here, Guadagna's claims were mooted after the Plaintiffs moved for class certification. The Defendant could continually pick off named plaintiffs in this case who had their services reduced by restoring their care to previous levels on a case by case basis. Without ensuring that all individuals who had their services

22

reduced were restored to their previous levels of care, claims such as Guadagna's are inherently transitory, and capable of repetition while evading review. In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution.

Second, there will be a constant class of persons suffering the deprivation complained of by Guadagna. Four thousand Medicaid recipients received home care services through GuildNet in Westchester, Suffolk, and Nassau counties as of March 1, 2017. Although the Plaintiffs have not provided evidence as to how many individuals switched to another MLTCP and were provided with less care, the Court is confident that there is a constant class of persons suffering the deprivation alleged in the complaint, due to the large number of former GuildNet enrollees.

Therefore, the Court finds that claims such as Guadagna's are inherently transitory, and his claims brought on behalf of the putative class survive because the motion for class certification could relate back to the date of the filing of the complaint.

*Id.* at 26–27.

By focusing solely on the first half of the August 2, 2018 Memorandum of Decision & Order and entirely ignoring the second half, the Commissioner misconstrues the Order as holding that the implementation of the Transition Policy mooted the claims of the *entire class*. That would only be true if the Transition Policy ensured continuity of care to every person who transferred from GuildNet to another MLTCP. However, the Transition Policy only applied prospectively -- it offered no rights or relief to former GuildNet enrollees who had transferred prior to its promulgation. As the Court recognized in the August 2, 2018 Order, the Commissioner may have restored Guadagna's care to its previous levels, but there were potentially numerous enrollees who left GuildNet before that date who lost care and for whom the Commissioner had not restored their care to their previous levels. *Id.* at 29 ("The Transition Policy did not affect Guadagna or those similarly situated.").

Thus, the Commissioner can only establish that this dispute is moot by demonstrating that long term care services, in fact, were restored to all of those individuals. The Court finds that the

23

Commissioner failed to do so here.  The Plaintiffs have put forward evidence that approximately 900 former GuildNet enrollees lost care and only 64 have received directives to restore care through the hotline established by Maximus.  Pls.' SOMF ¶ 51; Jois Decl. ¶ 10.  The Commissioner does not dispute that data produced during discovery at least facially demonstrates that those individuals lost care.  *See* Def.'s COMF ¶ 51 ("[A] first- glance comparison . . . indicated that hundreds of GuildNet enrollees received less of at least one long term care service in their new plan than they had been receiving from GuildNet prior to their transfers.").  The Commissioner only objects that "[v]erifying or disproving" these spreadsheets "would require significant investigation, including a full desk review, into each former GuildNet enrollee's applicable plans of care."  *Id.*  This argument, however, fails to recognize that "the burden of showing mootness logically falls on a defendant because, 'by the time mootness is an issue, the case has been brought and litigated, often (as here) for years.  To abandon the case at an advanced stage may prove more wasteful than frugal.'"  *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170, 120 S. Ct. 693, 699, 145 L. Ed. 2d 610 (2000)).  As a result, there still appears to be a justiciable controversy regarding the vast majority of the class.

Moreover, the Commissioner's contention that the mandatory six month reassessments of class members' levels of care moots their claims is equally unpersuasive.  PHL §§ 4403-f(7)(g)(i), 4403-F(7)(g)(iv).  The Plaintiffs contend they possessed a statutory right to maintain their existing level of services until receiving their opportunity for a fair hearing.  *See* 42 U.S.C. §§ 1396a(a)(3)–(4); 42 C.F.R. § 438.420(b); N.Y. Comp. Codes R. & Regs. tit. 18, § 358-3.6. The fact that class members have had their medical needs reassessed by their new MLTCPs since the commencement of this lawsuit, at most, casts doubt on the prudence of restoring class

members to their previous levels of care -- a consideration more pertinent to any remedy crafted by the Court.  It does not vitiate the alleged constitutional and statutory rights of the Plaintiffs to receive care at those levels.

Consequently, the Court finds that a live controversy exists and that proceeding to the merits of the parties' cross-motions is warranted.  Accordingly, the Court respectfully recommends to Judge Feuerstein that the Commissioner's motion for summary judgment on grounds of mootness be DENIED.

### B.    Claim Under the Medicaid Act

Count I of the Amended Complaint alleges that the reduction of Plaintiffs' long term care upon transferring to new MLTPs without adequate notice or a fair hearing violated the Medicaid Act.  *See* Am. Compl. ¶ 235.  The parties cross-move for summary judgment on this claim.  *See* Pls.' Mem. at 17-21; Def.'s Mem. at 30-38.  The Commissioner argues that there is no statutory or regulatory mandate "requir[ing] either the state, or an MLTCP that is entertaining an application for enrollment by a transferee from another MLTCP, to provide the prospective transferee with notice and an opportunity for a hearing when the new MLTCP assesses the transferee for lesser/different services than their current MLTCP."  Def.'s Mem. at 5, 30, 32. This argument, however, cannot be squared with the plain language of the Medicaid Act and its implementing regulations.  Section 1396a(a)(3) of the Medicaid Act provides:

> "A state plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness[.]"

42 U.S.C. § 1396a(a)(3).  The Second Circuit has construed this mandate to provide a private right of action, enforceable under Section 1983 of the Civil Rights Act, to receive a fair hearing. *See Shakhnes v. Berlin*, 689 F.3d 244, 254 (2d Cir. 2012) ("The District Court correctly held that

25

42 U.S.C. § 1396a(a)(3)—as construed by the regulation—creates a right, enforceable under § 1983, to receive a fair hearing and a fair hearing decision "'[o]rdinarily, within 90 days'" of a fair hearing request."); *Fishman v. Paolucci*, 628 Fed. App'x 797, 801 n.1 (2d Cir. 2015) ("We have held that § 1396a(a)(3) is enforceable through § 1983 and that precedent still controls.").

"In addition, federal regulations require that, whenever the state agency takes action to terminate, suspend, or reduce Medicaid eligibility or covered services, an applicant or recipient receive a fair hearing that meets the [constitutional] due process standards enunciated in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)." *Catanzano by Catanzano v. Dowling*, 60 F.3d 113, 117 (2d Cir. 1995). There are situations in which "the federal § 1396a(a)(3) right is broader than the due process right." *Paolucci*, 628 Fed. App'x at 801. However, because this regulation "merely further defines or fleshes out the content of" the right to an opportunity to Medicaid fair hearings, it "may reasonably be understood to be part of the content of the right to an opportunity for Medicaid fair hearings." *Shakhnes*, 689 F.3d at 255–56.

The Medicaid regulations which create the right to a fair hearing contain a number of provisions fleshing out the right to pre-termination notice. *See* 42 C.F.R. § 431.200(a) ("This subpart . . . [i]mplements section 1902(a)(3) of the Act, which requires that a State plan provide an opportunity for a fair hearing to any person whose claim for assistance is denied or not acted upon promptly."). Specifically, at least 10 days before the date of action, the agency must "inform every applicant or beneficiary in writing":

(1) Of his or her right to a fair hearing and right to request an expedited fair hearing;

(2) Of the method by which he may obtain a hearing;

(3) That he may represent himself or use legal counsel, a relative, a friend, or other spokesman; and

(4) Of the time frames in which the agency must take final administrative action, in accordance with § 431.244(f)."

*Id.* §§ 431.206(b) and 431.211.

Moreover, when the right to notice is triggered by, among other things, the denial of a

claim for services, the notice must also contain:

(a) A statement of what action the agency, skilled nursing facility, or nursing facility intends to take and the effective date of such action;

(b) A clear statement of the specific reasons supporting the intended action;

(c) The specific regulations that support, or the change in Federal or State law that requires, the action;

(d) An explanation of—

(1) The individual's right to request a local evidentiary hearing if one is available, or a State agency hearing; or

(2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and

(e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

*Id.* § 431.210.

The regulations also specify that this right extends to enrollees of MLTCPs. *Id.*

§ 438.400(a)(1) ("This subpart is based on . . . Section 1902(a)(3) of the Act requires that a State

plan provide an opportunity for a fair hearing to any person whose claim for assistance is denied

or not acted upon promptly."). MLTCPs "must give enrollees timely and adequate notice of an

adverse benefit determination in writing consistent with the requirements below and in

§ 438.10." *Id.* § 438.404(a). "[E]ach contract must provide for the [MLTCP] to notify the

requesting provider, and give the enrollee written notice of any decision by the [MLTCP] to deny

a service authorization request, or to authorize a service in an amount, duration, or scope that is less than requested." *Id.* § 438.210(c).

Moreover, the MLTCP must provide notice within 10 days of a denial of a claim for assistance which explains the following:

> (1) The adverse benefit determination the MCO, PIHP, or PAHP has made or intends to make.

> (2) The reasons for the adverse benefit determination, including the right of the enrollee to be provided upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the enrollee's adverse benefit determination. Such information includes medical necessity criteria, and any processes, strategies, or evidentiary standards used in setting coverage limits.

> (3) The enrollee's right to request an appeal of the MCO's, PIHP's, or PAHP's adverse benefit determination, including information on exhausting the MCO's, PIHP's, or PAHP's one level of appeal described at § 438.402(b) and the right to request a State fair hearing consistent with § 438.402(c).

> (4) The procedures for exercising the rights specified in this paragraph (b).

> (5) The circumstances under which an appeal process can be expedited and how to request it.

> (6) The enrollee's right to have benefits continue pending resolution of the appeal, how to request that benefits be continued, and the circumstances, consistent with state policy, under which the enrollee may be required to pay the costs of these services.

*Id.* § 438.404(b).

Thus, the Court finds that the Plaintiffs possessed a statutory right to notice and an administrative fair hearing because their Medicaid benefits were denied, reduced, or terminated. *See id.* § 431.220(a)(6) ("The State agency must grant an opportunity for a hearing to . . . [a]ny enrollee who is entitled to a hearing under subpart B of part 438 of this chapter."); 42 C.F.R. § 438.400 ("Adverse benefit determination means, . . . [t]he denial or limited authorization of a requested service . . . [or] . . . [t]he reduction, suspension, or termination of a previously

28

authorized service."), 438.402 (c)(1)(i) ("An enrollee may request a State fair hearing after receiving notice under § 438.408 that the adverse benefit determination is upheld."). Accordingly, the Plaintiffs were also entitled to receive benefits unchanged pursuant to aid continuing directives until a decision was issued after a fair hearing. *See id.* § 438.420(b); N.Y. Comp. Codes R. & Regs. tit. 18, § 358-3.6.

The Commissioner's argument that the Plaintiffs lacked such rights because there was no such statute or regulation specifically stating that they existed in the case of a transfer between MLTCPs is simply contrary to law. The Commissioner cites no legal authority for the proposition that statutory and regulatory mandates are only binding when they spell out every hypothetical scenario in which they could be implicated. The Medicaid Act and implementing regulations provide a definition of when an enrollee is entitled to a fair hearing and the Plaintiffs meet that definition here. Their rights did not disappear simply because they suffered the misfortune of enrolling in an MLTCP which happened to close.

Courts have held that Medicaid recipients possess a cause of action under Section 1396a(a)(3) when states fail to provide adequate notice of their right to a fair hearing with aid continuing pursuant to the statute's implementing regulations. *See, e.g.*, *Fishman by Fishman v. Daines,* No. 09-cv-5248 , 2016 WL 11496013, at *5 (E.D.N.Y. Mar. 10, 2016); *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 490 (D. Idaho 2014); *Kerr v. Holsinger*, No. 03-cv-68, 2004 WL 882203, at *7 (E.D. Ky. Mar. 25, 2004). "Without effective notice, a claimant's due process right to a fair hearing is rendered fundamentally illusory." *M.A. v. Norwood*, 133 F. Supp. 3d 1093, 1100 (N.D. Ill. 2015) (citing *Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005)); *see also Escalera v. New York City Hous. Auth.*, 425 F.2d 853, 862 (2d Cir. 1970) (noting that a hearing

would be of little value if the defendant could deny the claimants benefits based on reasons of which the claimants had no knowledge).

In *Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016), the defendant implemented new coverage restrictions on orthopedic footwear and compression stockings without providing affected beneficiaries notice of the changes or an opportunity to request evidentiary hearings to contest them.  Davis, 821 F.3d at 252.  The Second Circuit found that "§ 431.206 and § 431.210 . . . oblige New York to provide written notice of any 'action affecting [a beneficiary's] claim,'" so that "NYSDH violated the Medicaid Act's due process provision by failing to inform plaintiffs of its upcoming changes in coverage prior to termination."  *Id.* at 253.  In doing so, the Court of Appeals rejected the argument that failure to provide written notice of coverage changes was a harmless error:

> Where a statute explicitly prescribes procedures to be followed by a state agency prior to taking certain actions, the agency cannot avoid an injunction demanding compliance with those requirements by assigning plaintiffs the burden of demonstrating why such procedural requirements—enacted in a direct exercise of Congress's legislative judgment—are worth respecting in any given instance. As we have repeatedly recognized, § 1396a(a)(3) and its accompanying regulations endow individual beneficiaries under the Medicaid Act with an enforceable right to receive due process prior to state actions affecting their claims—including the right to receive written notice of policy changes.

*Id.* at 254.

In *Granato v. Bane,* 74 F.3d 406 (2d Cir. 1996), the New York Department of Social Services ("DSS") had a policy that terminated Medicaid recipients' home care services upon admission to the hospital.  *Granato,* 74 F.3d at 409-10.  The Second Circuit held that "the DSS's decision to treat the discontinuance of services during a hospitalization as an 'automatic' termination (as opposed to a suspension) of those services itself constitutes an agency 'action' as defined in the regulations."  *Id.* at 412.  "That action triggers a notice requirement and provides

30

Appellants with certain rights to due process," including the provision of "aid continuing until a decision is rendered after a hearing." *Id.* Further, the Second Circuit explained, "[t]he fact that home care services are unavailable during the period of hospitalization does not obviate the requirement that the DSS notify the recipient in a timely and adequate manner that those services are being treated as terminated, if that is what the agency decides to do." *Id.*

Similarly, in *Strouchler v. Shah*, 891 F. Supp. 2d 504 (S.D.N.Y. 2012), recipients of 24-hour continuous split-shift home care services moved for a preliminary injunction preventing the defendant from reducing services without adequate notice. *Strouchler*, 891 F. Supp. 2d at 505-505. In granting the preliminary injunction, the District Court found that the plaintiffs had demonstrated a likelihood that the defendant violated their rights to a fair hearing under the Medicaid Act. *Id.* at 525. In addition to finding that the notices violated the constitutional right to due process, the court explained that "the failure to provide sufficient notice [also] violate[d] the Medicaid statute and regulations." *Id.* at 520–21.

The Commissioner contends that these cases are distinguishable because the Plaintiffs here did not have their benefits terminated or reduced by GuildNet. *See* Def.'s Mem. at 25-26; Def.'s Reply at 6-9. Rather, the Commissioner advances the argument that the Plaintiffs willingly accepted new plans offering lesser services when they transferred out of GuildNet. *Id.* However, given the inadequacy of the notice provided to class members, the Commissioner's argument does not succeed. Tellingly, in its September 21, 2017 Letter, the DOH specifically described the transfer of GuildNet enrollees to new MLTCPs as "involuntary." Pls.' SOMF ¶ 43; Def.'s SOMF ¶ 37. GuildNet's March 2017 Letter, which the DOH approved, incorrectly informed the Plaintiffs that they must transfer to new plans by June 1, 2017 and provided no guarantee that Plaintiffs would be able to maintain the same level of care at their new MLTCP.

31

*See* March 20, 2017 Letter from GuildNet to Enrollees, Nese Decl., Ex. F at 44. The DOH's May 2017 Letter also stated that GuildNet enrollees would continue receiving their "existing services" until they transferred to new MLTCPs, but it again failed to set forth any statement about whether the enrollees could maintain the same level of services once they had transferred. *See* May 13, 2017 Letter from the DOH to Enrollees, Nese Decl., Ex. F at 6-7. The Commissioner cannot now hold the Plaintiffs' decision to accept lesser services from another MLTCP against the Plaintiffs because Plaintiffs lacked notice that they possessed a right to contest the determinations of their new MLTCPs at a fair hearing with aid continuing.

In response, the Commissioner maintains that the Outreach Letters sent in connection with the Transition Policy informed the Plaintiffs of their right to have their care restored. *See* Def.'s Mem. at 31-38. However, it is undisputed that between March 2017 and September 21, 2017, the Commissioner did not require other MLTCPs operating in the three relevant counties to offer GuildNet enrollees the same long term care services which they had been receiving from GuildNet. Pls.' SOMF ¶ 29. Nor did the Commissioner ensure the submission of timely and adequate notice to former GuildNet enrollees during that period. *Id.* ¶ 30. Notably, the DOH did not inform GuildNet enrollees that it was even working on a transition policy until September 2017. *Id.* ¶¶ 41, 45.

Post-deprivation process does not remedy the initial failure to protect the Plaintiffs' rights to pre-deprivation process. *See* 42 U.S.C. § 1396a(a)(3) ("A State plan for medical assistance must ... provide for granting an opportunity for a fair hearing *before* the State agency to any individual whose claim for medical assistance under the plan is denied") (emphasis added); *Fishman v. Daines*, 743 F. Supp. 2d 127, 144 (E.D.N.Y. 2010) ("In sum, the Court concludes

that ... § 1396a(a)(3) creates a right to a fair hearing *before* Medicaid recipients have their aid revoked.") (emphasis added).

The Commissioner also points to 42 C.F.R. § 438.62, which articulates the federal regulations regarding state policies handling the termination of MLTCPs. *See* Def.'s Mem. at 31-38. According to the Commissioner, because the regulation mandates that an enrollee's new MLTCP provide identical services to those provided by the prior MLTCP, there was is no requirement for notice and a fair hearing. *Id.* However, § 438.62 is inapposite. The regulation rests on a different statutory basis and does not concern the Plaintiffs' notice and fair hearing rights. *See* 42 C.F.R. § 438.62 (citing 42 U.S.C. 1302). It may be the case that the implementation of regulations in accordance with § 438.62 eliminated the risk of future violations, but that factor does not erase the separate pre-existing rights to notice and a fair hearing. The Plaintiffs do not contend they were entitled to receive identical services from their new MLTCPs in perpetuity as the Commissioner appears to assert. Rather, they claim a right to receive the same benefits *until the disposition of a fair hearing* challenging the assessment by their new MLTCP that their need for medical care was less than what had been assessed by GuildNet.

For this reason, the Commissioner's contention that the Plaintiffs had no right to continue their prior benefits because their new MLTCPs had a statutory obligation to assess their then-current medical needs similarly fails. *See* Def.'s Mem. 33-35; PHL §§ 4403-f(7)(g)(i), 4403-f(7)(g)(iv). Any assessment that the Plaintiffs should receive fewer services constituted an "adverse benefit determination." Thus, the DOH was required to provide the Plaintiffs an opportunity to challenge the factual findings underlying those assessments at a fair hearing, and to ensure continuity of care during the pendency of the fair hearing. *See* 42 C.F.R. §§ 431.210,

431.211, 431.220.  Even if the healthcare professionals at the new MLTCPs made their assessments based on their sound professional judgment as the Commissioner asserts, nothing compelled the DOH to afford those determinations unfettered, unreviewed deference which could not be challenged by the enrollees.

The fact that approximately 76% of enrollees who transferred to new MLTCPs received recommended levels of services which mirrored or exceeded the most recent GuildNet assessments for those individuals does not warrant a different outcome.  Those individuals fall outside the class definition, which only encompasses former GuildNet enrollees who "suffered reductions in care." DE 141 at 2.  Consequently, the fact that other enrollees who transferred received the same level of care is irrelevant to the present dispute because they received no "adverse benefit determination."

Relying on language in the August 2, 2018 Order, the Commissioner also asserts that imposing an obligation on the DOH to provide the Plaintiffs notice and opportunity for a fair hearing would be unworkable with Judge Spatt's prior findings.  *See* Def.'s Mem. at 35-36.  The August 2, 2018 Order provided:

> Neither Samele nor Roher had their benefits reduced, suspended, or terminated. As such, they were not entitled to notice or a fair hearing.  At the time they each joined the suit, they were still receiving the same level of care from GuildNet that they had always received, and were informed by the Commissioner that they would be receiving the same level of care from GuildNet until they transitioned to a new plan.  Therefore, they did not suffer an injury in fact.

August 2, 2018 Mem. & Order at 13.

Consequently, the right to notice and a fair hearing was not conferred merely because a *potential* MLTCP in which a Plaintiff *never enrolled* assessed the Plaintiff for lesser care:

> Neither Samele nor Roher ever had their benefits terminated, suspended or reduced. The MLTCPs did not have to send notice of their right to a fair hearing with aid continuing to those Plaintiffs because they had not enrolled in those plans, and

34

therefore there was no date certain when Samele and Roher would have their benefits reduced.

Furthermore, the Plaintiffs' proposition that MLTCPs provide notice and a fair hearing anytime they are assessed for less care than they previously received is unworkable. For instance, Roher's daughter contacted five different MLTCPs after GuildNet sent their initial notice. Under the Plaintiffs' asserted interpretation of the statute and regulations, all five would have had to offer Roher notice and a fair hearing even though she was not yet enrolled with any of the plans. Conversely, if two offered fewer services than GuildNet had, but three offered the same as or more than GuildNet, the two that offered less would still have to provide notice and a fair hearing even if Roher had enrolled with one of the other three because the two that offered her less care would be unaware that other MLTCPs were offering a higher level of care.

In that way, neither Samele nor Roher were at risk of losing their care. Instead, at the time they each joined the action, the risk was hypothetical or conjectural.

*Id.* at 14–15.

In contrast, Judge Spatt found that Guadagna *did* suffer an injury in fact because he actually transferred out of GuildNet and received less care from his new MLTCP:

However, as the Defendant seemingly concedes, Guadagna does have standing. Indeed, the Court finds that when Guadagna enrolled in Agewell, and received less care than he had received under GuildNet without notice of a right to a fair hearing with aid continuing, he suffered injury. The Court notes that the Defendant's silence on Guadagna's standing seemingly contradicts their position that an MLTCP need not provide notice of a right to a fair hearing when an enrollee decides to switch to their plan and receive less care. By conceding Gaudagna's standing, the Commissioner seemingly admits that AgeWell should have afforded notice of a right to a fair hearing when they provided him with less care than he received under GuildNet. . . . Guadagna suffered injury when AgeWell authorized him for less care than he received from GuildNet, and was not provided with notice of a right to a fair hearing.

*Id.* at 17–18. This finding is entirely consistent the Court's ruling that the Defendant violated the Plaintiffs' statutory rights. Until a class member enrolled in a new MLTCP, there was no obligation to provide such notice. But once the enrollee chose to leave GuildNet to join that MLTCP, that MLTCP had to provide the enrollee adequate notice of a right to a fair hearing with aid continuing.

Lastly, the Commissioner argues that the DOH is not responsible for any violation of the Plaintiffs' rights because MLTCPs were already aware of and required by regulation to provide adequate notice of a right to a fair hearing with aid continuing.  However, by regulation, the Commissioner is solely responsible for supervising implementation and issuing "policies, rules, and regulations" to ensure compliance. 42 C.F.R. § 431.10(e); *see also Hillburn by Hillburn v. Maher*, 795 F.2d 252, 261 (2d Cir. 1986) ("[T]he reason for the requirement that a state designate a 'single State agency' to administer its Medicaid program . . . was to avoid a lack of accountability for the appropriate operation of the program."); *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 112 (4th Cir. 2013) ("[T]he vesting of responsibility over a state's Medicaid program in a single agency safeguards against the possibility that a state might seek to evade federal Medicaid requirements by passing the buck to other agencies… .").  Thus, the Commissioner had a responsibility to ensure the vindication of the Plaintiffs' rights, and a statutory violation occurred notwithstanding the fact that the agents who failed to provide notice were the MLTCPs and not the Commissioner directly.  *See Shakhnes*, 689 F.3d at 248 ("Although the State agency may delegate to local entities the performance of certain responsibilities, the State agency must (1) have methods to keep itself currently informed of the adherence of local entities to the State plan provisions and the agency's procedures for determining eligibility, and (2) take corrective action to ensure their adherence"); *Catanzano*, 60 F.3d at 118 (holding action by private entity administering Medicaid benefits constituted "state action that triggers plaintiffs' due process rights."); *Strouchler*, 891 F. Supp. 2d at 523 ("[A]s federal regulations and the Second Circuit have made clear, the State must ensure compliance with the Medicaid Act; although the City acts as the State's agent, the State bears ultimately responsibility for the program.").

36

Therefore, the Court finds that the Plaintiffs have demonstrated the absence of a genuine issue of material fact as to the Commissioner's violation of the Medicaid Act and respectfully recommends to Judge Feuerstein that summary judgment on this claim be GRANTED in favor of the Plaintiffs.

### C.    Procedural Due Process Claim

Count I of the Amended Complaint also alleges that the reduction of Plaintiffs' long term care upon transferring to new MLTPs without adequate notice or a fair hearing violated the Plaintiffs' procedural due process rights under the Fourteenth Amendment.  *See* Am. Compl. ¶ 235.  The parties cross-move for summary judgment on this claim.  *See* Pls.' Mem. at 17-21; Def.'s Mem. at 30-38.

To establish a violation of the Fourteenth Amendment's right to procedural due process, a plaintiff must establish that he or she "was deprived of property . . . without constitutionally adequate pre- or post-deprivation process."  *Ahlers v. Rabinowitz*, 684 F.3d 53, 62 (2d Cir. 2012).  As Medicaid enrollees, the Plaintiffs unquestionably possessed a property right in continued receipt of their health benefits.  *See Duncan v. Sullivan Cty.*, No. 18-CV-9269, 2020 WL 1033064, at *8 (S.D.N.Y. Mar. 2, 2020) ("It is settled that Medicaid benefits 'are a protectable property interest under the Fourteenth Amendment.'") (quoting *Mayer v. Wing*, 922 F. Supp. 902, 910 (S.D.N.Y. 1996)).  Thus, the only question is whether the Comissioner afforded Plaintiffs sufficient procedural due process.

In general, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."  *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (emphasis in original); *see also Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998) ("Ordinarily, the Due Process Clause requires that the state not deprive an

individual of a significant liberty or property interest without affording notice and some opportunity to be heard *prior to the deprivation*." (emphasis added)).  However, "'[n]otice and the hearing are two distinct features of due process, and are thus governed by different standards.'" *Fishman ex rel. Fishman v. Daines*, No. 09-CV-5248, 2014 WL 4638962, at *6 (E.D.N.Y. Sept. 16, 2014), *vacated and remanded on other grounds sub nom. Fishman v. Paolucci*, 628 Fed. App'x 797 (2d Cir. 2015).

 To determine the adequacy of notice, courts inquire as to whether the defendant disseminated "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).  This requirement imposes a good faith obligation on the government to employ means which amount to more than just a "gesture," but rather "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* at 315, 70 S.Ct. 652; *accord Luessenhop v. Clinton County*, 466 F.3d 259, 269 (2d Cir. 2006) (discussing government's "obligation to make a good faith attempt to inform interested parties").

As for the sufficiency of the hearing, courts "weigh:  (1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 167–68 (2d Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

For substantially the same reasons the Commissioner violated the Medicaid Act, the Court finds that the Commissioner also deprived the Plaintiffs of their right to procedural due process.  As discussed, GuildNet's March 2017 Letter and the DOH's May 2017 Letter resulted in the Plaintiffs leaving GuildNet and accepting reduced services without ever receiving notice of a right to a fair hearing with aid continuing.  Consequently, it cannot be said that these letters were reasonably calculated under the circumstance to apprise the Plaintiffs of the pendency of the action and afford them an opportunity to present their objections.  *See Homewood v. McCarthy*, No. 15-CV-1119, 2015 WL 3541290, at *1 (S.D. Ohio Apr. 2, 2015) (finding plaintiffs established a likelihood of success on the merits by alleging that notices "fail[ed] to inform recipients of their rights to keep their Medicaid if they request a state hearing"); *Oster v. Lightbourne*, No. C 09-4668 CW, 2012 WL 691833, at *17 (N.D. Cal. Mar. 2, 2012) (finding plaintiffs established a likelihood of success on the merits by alleging that notices "could confuse or mislead a recipient to believe that [they lacked] an opportunity to appeal the twenty percent reduction of his or her own service hours that resulted from the law").

Moreover, it is undisputed that the Plaintiffs received no notice and opportunity for a fair hearing prior to the reduction of their benefits and that the only remedy offered to them was the opportunity to call the Maximus Hotline to have their benefits restored after the implementation of the Transition Policy.  Pls.' SOMF ¶ 30; *see also* First DOH Outreach Letter dated September 25, 2017, Nese Decl., Ex. F at 8-9; Third DOH Outreach Letter, Nese Decl., Ex. F at 16-17.  The Commissioner does not allege that the cause of the deprivation was the "random" and "unauthorized" conduct of a state agent.  *Zinermon*, 494 U.S. at 130, 110 S.Ct. 975 ("The justifications which we have found sufficient to uphold takings of property without any pre-deprivation process are applicable to a situation such as the present one involving … a random

and unauthorized act by a state employee") (citation omitted).  Therefore, this post-deprivation

remedy cannot cure the absence of pre-deprivation process.  *See New Windsor Volunteer*

*Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 116 (2d Cir. 2006) ("Meyers's actions cannot

be termed random or unauthorized; his actions with respect to the Corps were the 'actions of the

Town itself.'  Accordingly, the Corps was entitled to notice and an opportunity to be heard before

the Town seized its property. It received neither."); *Manza v. Newhard*, 470 Fed. App'x 6, 9 (2d

Cir. 2012) ("[A] sufficient post-deprivation remedy . . . does not address whether Manza

received sufficient pre-deprivation process.").

Therefore, the Court finds that the Plaintiffs have demonstrated the absence of a genuine

issue of material fact as to the violation of their procedural due process rights pursuant to the

Fourteenth Amendment.  Accordingly, the Court respectfully recommends to Judge Feuerstein

that summary judgment on the Plaintiffs' procedural due process claim be GRANTED in

Plaintiffs' favor.

### D.      Substantive Due Process Claim

Count II of the Amended Complaint alleges that the new MLTPs' determination of

Plaintiffs' long term care services based on "non-individualized criteria" violated the Plaintiffs'

substantive due process rights under the Fourteenth Amendment.  *See* Am. Compl. ¶ 236.  The

parties cross-move for summary judgment on this claim.  *See* Pls.' Mem. at 17-21; Def.'s Mem.

at 30-38.  In moving for summary judgment, however, Plaintiffs appear to reframe their

substantive due process claim from the one alleged in the Amended Complaint.  Plaintiffs

contend that the new MLTPs' failure to review the plan of care which was being provided to the

Plaintiffs by GuildNet at the time -- and to compare that plan of care with their medical needs at

the time of their transfer -- constituted an "arbitrary" action in violation of their substantive due process rights.  *See* Pls.' Mem. at 18-19.

"[T]he Due process Clause of the Fourteenth Amendment embodies a substantive component that protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  *Doe v. Zucker*, No. 12-CV-0840, 2021 WL 619465, at *20 (N.D.N.Y. Feb. 17, 2021) (citing *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996)).  To succeed on a substantive due process claim, a plaintiff must show (1) she had a valid property interest and (2) defendants infringed on that property interest in an arbitrary or irrational manner.  *Burdick v. Cty. of Putnam*, No. 10-CV-0624, 2012 WL 360644, at *2 (S.D.N.Y. Feb. 2, 2012) (citing *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir. 2001)); *accord Gallagher v. Bd. of Educ. of E. Hampton Union Free Sch. Dist.*, No. 16-CV-473, 2017 WL 8813134, at *6 (E.D.N.Y. Dec. 21, 2017), *report and recommendation adopted as modified*, No. 16-CV-0473, 2018 WL 798882 (E.D.N.Y. Feb. 9, 2018) (citation omitted).  Specifically, "a plaintiff must demonstrate [...] that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005); *accord Ying Li v. City of New York*, 246 F. Supp. 3d 578, 631 (E.D.N.Y. 2017) (citing *Bolmer v. Oliveira*, 594 F.3d 134, 142 (2d Cir. 2010)); *Natale v. Town of Ridgefield,* 170 F.3d 258, 262 (2d Cir. 1999) ("For state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.'") (citation omitted).  "It is not enough that the government act [was] 'incorrect or ill-advised[.]'"  *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.

41

1995)).  "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* (citation and quotation marks omitted).

Here, neither party has submitted any evidence demonstrating how the new MLTCPs actually assessed the long term care services offered to the transferring GuildNet enrollees. Nonetheless, Plaintiffs specifically take issue with the new MLTCPs' purported failure to conduct a "comparison of the [Plaintiffs'] current needs to their prior plan[s] of care."  Pls.' Mem. at 19-20.  Plaintiffs argue that an MLTCPs' obligation to conduct this comparison may be inferred from N.Y. Comp. Codes R. & Regs. tit. 18, § 505.14 (b)(5)(v)(c)(1), which sets forth the appropriate reasons an MLTCP may reduce a Medicaid recipient's plan of care in the first instance.

Even assuming the new MLTCPs did not conduct the comparison as articulated by the Plaintiffs, the Court finds that the Plaintiffs have not submitted legal or factual support to demonstrate that the failure to do so constituted "arbitrary" and "egregious" conduct that rises to the level of "shocks the conscience."  Section 505.14 (b)(5)(v)(c)(1) enumerates several reasons a Medicaid recipient's care may be reduced, including:

> (i) the client's health and safety cannot be assured with the provision of personal care services. The notice must identify the reason or reasons that the client's health and safety cannot be assured with the provision of personal care services;
>
> (ii) the client's medical condition is not stable. The notice must identify the client's medical condition that is not stable;
>
> (iii) the client is not self-directing and has no one to assume those responsibilities;
> (iv) the services the client needs exceed the personal care aide's scope of practice. The notice must identify the service or services that the client needs that exceeds the personal care aide's scope of practice;
>
> (v) the client refused to cooperate in the required assessment;

42

(vi) a technological development, which the notice must identify, renders certain services unnecessary or less time-consuming;

(vii) the client resides in a facility or participates in another program or receives other services, which the notice must identify, which are responsible for the provision of needed personal care services; and

(viii) the client can be more appropriately and cost-effectively served through other Medicaid programs or services, which the notice must identify.

*Id*.

A "comparison of the [Plaintiffs'] current needs to their prior plan[s] of care" is not necessarily required for an MLTCP to determine the existence of each of these reasons. Moreover, as argued by the Commissioner, the fact that certain Plaintiffs may have had their plan of care reduced even though their medical conditions did not change does not, by itself, automatically render the decision to reduce their plans of care "arbitrary" or "outrageous." *See* Pls.' Mem. at 19; Def.'s Mem. at 34. Therefore, the Court respectfully recommends to Judge Feuerstein that Plaintiffs' motion for summary judgment on its substantive due process claim be DENIED and that Defendant's motion for summary judgment on this claim be GRANTED.

### E.    Claims under the Rehabilitation Act and ADA

Count III of the Amended Complaint alleges that the Commissioner's failure to ensure that the Plaintiffs maintained their long term care benefits upon their transfer to a new MLTCP threatened to result in unnecessary institutionalization of the Plaintiffs, in violation of the ADA and the Rehabilitation Act. *See* Am. Compl. ¶ 237. The Commissioner moves for summary judgment on these claims. *See* Def.'s Mem. at 41-44. Since the Plaintiffs failed to respond to the Commissioner's motion as to these claims, the Court considers the claims abandoned. *See Williams v. Suffolk Cty.*, 284 F. Supp. 3d 275, 284 (E.D.N.Y. 2018) ("The Plaintiff did not respond, in any way, to the Defendants' arguments concerning his malicious prosecution claim.

43

Therefore, that claim is deemed abandoned.") (collecting cases); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 355 (E.D.N.Y. 2014) ("[N]owhere in his papers does the Plaintiff articulate a substantive due process claim. To the extent the Plaintiff may have asserted such a claim in his amended complaint, he is deemed to have abandoned it on this motion.").

For these reasons, the Court respectfully recommends to Judge Feuerstein that the Commissioner's motion for summary judgment on Plaintiffs' claims under the Rehabilitation Act and the ADA be GRANTED.

### F.    Permanent Injunctive Relief

As part of its motion for summary judgment, the Commissioner separately requests that the Court deny the Plaintiffs' a permanent injunction as a remedy for the alleged violations.  A plaintiff seeking a permanent injunction must show that:  (1) he or she has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be negatively affected by the issuance of a permanent injunction.  *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010).   The Commissioner has not adequately addressed these individual factors beyond merely repeating the arguments made on the merits of the motion, nor does he address the specific injunctive relief sought in the Amended Complaint.  Therefore, the Court respectfully recommends to Judge Feuerstein that Defendant's motion for summary judgment on the Plaintiffs' claim for injunctive relief be DENIED.

## V.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Feuerstein that: (1) the Plaintiffs' motion for summary judgment be GRANTED as to their Medicaid Act and

procedural due process claim (Count I), but DENIED as to their substantive due process claim (Count II); and (2) Defendants' motion for summary judgment (i) be DENIED as to the Plaintiffs' Medicaid Act and procedural due process claim (Count I) and the claim for permanent injunctive relief, but (ii) GRANTED as to the Plaintiffs' substantive due process claim (Count II) and claims under the ADA and Rehabilitation Act (Count III).

## VI.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See* Fed. R. Civ. P. 6(a), (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  Any objections by a *pro se* party shall be filed with the Clerk of the Court by overnight mail or regular mail.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Sandra J. Feuerstein.  Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the fourteen (14) day period for filing objections**.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


                                              **SO ORDERED.**

Dated: Central Islip, New York
       March 20, 2021


                                              /s/ A. Kathleen Tomlinson
                                              A. KATHLEEN TOMLINSON
                                              U.S. Magistrate Judge